Ruidoso Racing Association, Inc. v. Commissioner.
Ruidoso Racing Asso. v. Commissioner
Docket No. 1216-68.
United States Tax Court
T.C. Memo 1971-194; 1971 Tax Ct. Memo LEXIS 137; 30 T.C.M. (CCH) 792; T.C.M. (RIA) 71194; August 9, 1971, Filed *137 During the taxable years 1959 through 1961, inclusive, petitioner-corporation owned and operated a racetrack at Ruidoso Downs, New Mexico. Its majority stockholder and secretary-treasurer, Eugene V. Hensley, during this period formulated policy, maintained supervision of its records, and had virtually unlimited control of petitioner's business affairs. In 1967, Hensley was convicted for evasion of his own income tax and for making and subscribing false returns with respect to petitioner for the years 1959 and 1960. The criminal income tax case against Hensley involved his use of corporate funds for his own and his family's personal benefit. In addition to diverting such funds for his personal advantage, he caused petitioner to expense various amounts which properly should have been capitalized in order to diminish his own and petitioner's taxes. Many of his transactions involved the use of false and fictitious records. Held: (1) That with respect to the deficiencies determined for the years 1959, 1960, and 1961, petitioner failed to meet the burden of establishing error on the part of respondent. (2) That part of the deficiencies in each of the years 1959, 1960, and 1961 was *138 due to fraud with intent to evade taxes, which is properly imputed to petitioner, and hence, petitioner is liable for the addition to tax under sec. 6653(b), I.R.C. 1954. James Powers, 807 Security Bldg., 234 N. Central Ave., Phoenix, Ariz., for the petitioner. D. Ronald Morello, for the respondent. 793 WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: This proceeding involves the determination *139 of deficiencies in income tax and additions to tax as follows: Additions to
Year
Deficiency
tax sec. 6653(b)
1959
$118,758.88
$59,379.44
1960
150,055.09
75,027.55
1961
148,295.58
74,147.79
The principal issues presented for our consideration are: (1) Whether the adjustments made to petitioner's income for the years 1959, 1960, and 1961, as set forth in the notice of deficiency, are proper and therefore result in the receipt of income which the corporation failed to report in its Federal income tax returns filed for those years and the extent thereof; (2) Whether any part of the deficiency determined against petitioner for each of the taxable years involved was due to fraud with intent to evade tax within the meaning of section 6653(b) of the 1954 Code; and if not so, (3) Whether the assessment and collection of the deficiencies for the years involved is barred by the statute of limitations as provided by section 6501(a) of the Code of 1954. Findings of Fact Part of the facts are stipulated and together with stipulated exhibits are so found and incorporated by this reference. [1]
*140 Petitioner is a corporation incorporated under the laws of the State of New Mexico in 1947. During the taxable years involved herein, it was engaged in the operation of a horse racetrack at Ruidoso Downs, New Mexico, its principal place of business. Petitioner filed income tax returns for the years 1959, 1960, and 1961 with the district director of internal revenue at Albuquerque, New Mexico. Ruidoso Downs is located in the Sacramento Mountains of New Mexico at an altitude of about 7,000 feet. During the taxable years involved herein, there was no airline or rail service to the area. The nearest major airport was at El Paso, Texas, some 130 miles away. Albuquerque is approximately 160 miles to the north. By ground transportation, the area could only be reached from any direction through winding mountain roads. There was a small air field in the area which could be used only during daylight hours. Racing meets were conducted on weekends during the summertime and the average season was about 54 days. The track specialized in quarterhouse racing and offered parimutuel wagering which was legal in New Mexico but was not legal in the neighboring States of Oklahoma and Texas. The track *141 drew heavily from those two States for its customers. The petitioner's racing plant consisted of a 5/8-mile oval track, a 510-yard straightaway, about 25 barns with 1,200 stalls, and a grandstand seating 3,500 to 4,000 people. The Ruidoso Jockey Club was a private turf club owned by a separate legal entity with seating space for about 1,200 people. Its facilities were physically a part of the grandstand and during the years involved herein those facilities were leased to petitioner which operated the club. The petitioner also owned a guest house at which celebrities and horseowners and bettors were entertained. In 1960, petitioner disposed of the guest house it then owned and began construction of a new and larger one. The stalls in the barn area were made of wood. They required repairs every year. The water pipes in the barn area required constant repairs and patching. The petitioner repainted the barns every year and painted the grandstand at least every other year. The channel of a river ran through the grounds of the track and it required dredging. Digging and trenching equipment was also required in the replacement of pipe. In 1953, a controlling interest in the stock *142 of petitioner was acquired by Eugene V. Hensley, hereinafter sometimes called Hensley. From 1934 to 1953, Hensley was engaged in the wholesale liquor business and in the ownership of bars. He had two children, Gary and Donna, by his first wife, Catherine, from whom he was divorced in 1945. In that year, he married Martha by whom he had two more children, Eugene, Jr., and Michael. In 1953, Hensley moved to Ruidoso while his wife stayed in Phoenix. She filed suit for divorce against him in the Arizona courts in October 1953. Hensley took up permanent legal residence in New Mexico. He had an apartment in the 794 grandstand at Ruidoso where he lived throughout the taxable years here involved. His wife continued to live in Phoenix. In 1953, after Hensley acquired controlling interest in petitioner's stock, he was elected a member of the board of directors and secretary-treasurer of the corporation. The president was Jim Derrick who was a rancher. He also had some connections with Gateway Motors, to be discussed infra. The vice president was J. L. Taylor who was engaged in ranching, oil, and banking. Until 1962, the three of them also constituted the board of directors. In addition *143 to being secretary-treasurer of petitioner, Hensley was director of racing which was a position of broad powers under the petitioner's by-laws. These by-laws read, in pertinent part, as follows: Section 6. Director of Racing. The director of racing shall be the principal executive officer of the corporation insofar as it pertains to the physical operation of a racing plant and its related facilities, and shall have the authority of a general agent, without limitation, to act for the corporation in all matters pertaining to the business of racing, betting, construction of the physical plant, and the repair and maintenance of the power, light, water and related utilities. The director of racing shall determine the policy of racing to be established in the operation of the racetrack, and set standards governing purses, caliber of horses, number of races, qualifications for officials and employees, and in general to approve and encourage the racing of both Thoroughbred and Quarter horses for the best interest of the corporation, the horsemen and the betting public. The Director of racing of the corporation may hold the office of President, Vice President or Secretary-Treasurer and *144 his racing powers shall be in addition to those powers given the aforesaid officers, and as it pertains to racing shall have commensurate powers with the President in the signing of all documents necessary for the efficient and expedient operation of the racing division of the corporation's activities. The director may hire and discharge executives, employees, counsel and officials, expend monies for advertising, construction, litigation and entertainment. The director shall borrow sufficient monies to provide a betting fund and to make change for pari-mutuel betting. Petitioner's authorized capital stock was 8,000 shares, of which 8 shares were unissued. During the years involved herein, Hensley owned 5,025 shares out of the total outstanding 7,992 shares, representing 62.8 percent ownership. Included in this 5,025 shares were 1,810 shares of stock pledged on a loan with the First National Bank of Artesia, New Mexico. The bank held an irrevocable proxy to vote the 1,810 shares. Hensley voted these shares during the years involved, and also received the dividends paid thereon. On Hensley's 1962 income tax return, he reported the sale of these 1,810 shares of stock, listing an acquisition *145 date in April 1955, and a long-term capital gain of $36,500. During the taxable years involved herein, in addition to Hensley, there was a total of 53 stockholders who owned varying numbers of shares, the three largest being blocks of 522,450 and 300 shares. Most of these stockholders lived in New Mexico, 17 of them lived in Texas, 4 in Arizona, and 1 each in Florida, Kansas, and Arkansas. After Hensley took over the management of the track, the quality of the horses, the size of the purses, the annual attendance, and the parimutuel "handle" or gross track revenue all increased. During the taxable years involved herein, the petitioner's income from parimutuel wagering was as follows: Total
Year
Net handle
Commissions
Breakage
track revenue
1959
$10,799,660
$1,619,949.00
$ 82,020.85
$ 1,817,137.60
1960
11,567,445
1,735,116.75
161,169.10
1,865,830.60
1961
11,364,410
1,704,661.50
172,503.90
2,000,397.60
One of Hensley's principal promotions was the All-American Futurity. The promotion contemplated that horseowners throughout the country would nominate their horses soon after they were foaled and would pay a small fee at that *146 time, but would be required to make periodic payments thereafter in order to keep the horses eligible to run in the trials as 2-year olds. The trial established which horses would actually run in the race. The funds so acquired made up the bulk of the purse although the petitioner itself contributed something to it. 795 This race was first run in 1959 with a purse of $129,999. It ultimately became one of the richest horse races in the country with a purse exceeding $400,000. The race was broadcast over national television on four or five occasions. Articles about the race and about the petitioner's track also appeared in magazines with nationwide circulation. In his statutory notice, respondent determined that petitioner had unreported income and unallowable deductions as follows: Taxable years ended
Increases (Decreases) in income
12/31/59
12/31/60
12/31/61
(a) Income from bar and food sales
$ 73,894.78
$ 90,340.20
$ 71,334.26
(b) Purchases
74.51
(c) Loss on sale of 1958 Cadillac
198.97
(d) Operating expenses
124,839.42
170,330.93
161,944.53
(e) Administrative expense
5,144.68
(f) Airplane expenses
21,680.10
27,896.34
25,221.86
(g) Deferred credits
550.00
(h) Reserve for unclaimed tickets
2,000.00
(i) Non-sufficient fund checks
6,550.00
(j) General expenses
20,133.17
*147 On the basis of the aforementioned adjustments, respondent determined the deficiencies in income tax and additions to tax under section 6653(b) of the 1954 Code for the years 1959, 1960, and 1961 in the amounts set forth hereinabove. Included in respondent's determination of deficiencies for the taxable years involved herein are ten categories of unreported income and unallowable deductions. Findings of Fact relating to these categories are as follows: (a) Income from bar and food sales. During the taxable years involved herein, petitioner operated a bar downstairs in the grandstand. In addition, liquor was sold in the Jockey Club which was then being operated by petitioner. Petitioner also sold bottled beer in its bar and in the Jockey Club. In addition to the downstairs bar and the Jockey Club bar, petitioner, on occasion, provided free drinks in Hensley's office and in the press club to newsmen, television and radio people, celebrities, horseowners, and big bettors, especially on Sundays when State law prohibited the sale of liquor in New Mexico. Petitioner maintained no record of the amount of alcoholic and nonalcoholic beverages which it provided gratis to its patrons *148 and members of the press. During the taxable years involved herein, petitioner's sale of alcoholic and nonalcoholic beverages which were not recorded on its books or records or reported on its income tax returns for these years were as follows: Year
Amount unreported
1959
$73,894.78
1960
90,340.20
1961
71,334.26
Respondent computed the corrected sales of alcoholic and nonalcoholic beverages by dividing the amounts of liquor, wine, and beer sold by the standard amount of each drink sold and then multiplying by the price charged per drink. During the taxable period involved, petitioner purchased liquor and beer (by cases, cartons, and one-half barrels) as follows: Description
1959
1960
1961
Cases of fifths (liq.)
365-5/12
381-5/12
349-2/12
Cases of quarts (liq.)
114
114
96
Cartons of miniatures (liq.)
464
706
429
Cases of beer
3,630
2,491
1,056
1/2 barrels of draft beer
197
20
(b) Purchases. During the year 1959, the petitioner on its books and records and on its Federal income tax return reported business expenses for bar stock and supplies, which to the extent of $74.51, were for the personal use and *149 benefit of Hensley. (c) Loss on sale of 1958 Cadillac. For the year 1959, petitioner on its books and records reflected a loss on the sale of a 1958 Cadillac automobile in the amount of $198.97, and deducted the loss on its 1959 income tax return when, in fact, the automobile was used exclusively for the 796 personal benefit and use of Hensley's wife in Phoenix, Arizona. (d) Operating expenses. (1) During the year 1959, petitioner on its books and records and on its income tax return for the taxable year 1959 reported operating expenses in the amount of $478,539.16. Of this amount, $124,839.42 was based on false and fictitious record entries and did not constitute operating expenses of petitioner. Such operating expenses deducted by petitioner and disallowed by the respondent are as follows: Deduction
Operating expenses
Deducted
disallowed
Advertising
$ 32,912.67
$ 15,471.72
Concessions and parking
25,409.59
300.78
Depreciation
60,651.31
14,018.17
Maintenance and repairs
57,587.50
28,090.72
Gas, oil and servicing
12,285.61
961.28
Insurance
22,512.88
356.90
General supplies
8,887.64
1,141.29
Management relations
523.52
519.02
Equipment rentals and repairs
28,260.48
17,940.89
Postage and freight
13,636.09
27.85
Promotion
850.09
750.09
Rentals
1,366.00
1,366.00
Salaries and wages
187,551.76
33,877.62
Travel expense
11,734.77
8,402.91
Utilities
12,641.47
291.74
Uniforms 1,727.78
1,322.44
$478,539.16
$124,839.42
*150 (2) During the year 1960, petitioner on its books and records and on its income tax return for the taxable year 1960 reported operating expenses in the amount of $824,477.28. Of this amount, $170,330.93 was based on false and fictitious record entries and did not constitute operating expenses of petitioner. Such operating expenses deducted by petitioner and disallowed by respondent are as follows: Deduction
Operating expenses
Deducted
disallowed
Advertising
$ 47,145.76
$ 11,414.58
Bad debts
9,050.00
8,350.00
Depreciation
68,852.86
15,133.97
Donations, dues and subscriptions
7,454.44
1,289.10
Equipment rentals and repairs
44,454.49
25,781.67
General supplies
12,172.62
3,709.58
Gas, oil and servicing
23,184.64
1,789.69
Insurance
29,474.10
913.96
Laundry
4,060.18
313.78
Maintenance and repairs
58,097.62
43,641.73
Promotion
5,879.71
5,576.46
Postage and freight
15,837.50
108.58
Rent
67,912.23
75.00
Salaries and wages
371,528.51
43,517.62
Travel expenses
18,110.28
3,041.46
Utilities
16,363.00
361.59
Uniforms
695.60
312.16
Contracts 24,203.74
5,000.00
$824,477.28
$170,330.93
(3) During the year 1961, *151 petitioner on its books and records and on its income tax return for the taxable year 1961 reported operating expenses in the amount of $552,354.40. Of this amount, $161,944.53 was based on false and fictitious record entries and did not constitute operating expenses of petitioner. Such operating expenses deducted by petitioner and disallowed by respondent are as follows: 797 Deduction
Operating expenses
Deducted
disallowed
Bar purchases
$ 796.07
$ 796.07
Depreciation
53,292.17
26,234.39
Equipment repairs
19,439.57
319.05
Gas, oil, tires and servicing
16,352.45
1,037.69
Kitchen stock and supplies
788.20
788.20
Maintenance and repairs
28,877.61
18,591.54
Salaries and wages
351,081.18
108,241.77
Tools, materials and supplies
6,731.83
1,509.48
Totalizator costs
48,723.94
602.00
Travel
10,398.53
679.80
Utilities 15,872.85
3,144.54
$552,354.40
$161,944.53
(e) Administrative expense. During 1959, petitioner on its books and records and on its income tax return for 1959 reported administrative expenses in the amount of $14,530.03. Of this amount, $5,144.68 was based on false and fictitious record entries and did not *152 constitute administrative expenses of petitioner. Such administrative expenses deducted by petitioner and disallowed by respondent are as follows: Deduction
Administrative expense
Deducted
disallowed
Interest expense
$ 2,735.04
$ 450.00
Management relations
585.45
487.60
Postage and stationery
435.05
128.05
Promotion
3,087.15
2,961.72
Travel expense 7,687.34
1,117.31
$14,530.03
$5,144.68
(f) Airplane expenses. During the taxable years involved herein, Hensley had an airplane and pilot at his disposal while working at Ruidoso Downs. The plane was used sometimes during the racing season to transport newscasters, sportswriters, and other press and television people to and from Ruidoso, as well as horseowners and customers who lived in remote areas of Texas and Oklahoma. During the taxable years 1959, 1960, and 1961, petitioner deducted as business expense related to the airplane and pilot, the amounts of $ 28,906.80, $37,195.12, and $33,629.15, respectively. Only 25 percent of the aforementioned amounts was used for the corporation's business and the remaining 75 percent was attributable to the personal use of the airplane by Hensley. *153 (g) Deferred credits. Petitioner received the amount of $550 in 1955 as a deposit for the purpose of sponsoring a race. Petitioner retained this deposit. Respondent determined that the $550 was income of 1959 and increased its income accordingly. (h) Reserve for unclaimed tickets. Petitioner set up a reserve for unclaimed tickets from mutual income in 1955 in the amount of $2,000. This amount was not an allowable reserve deduction and was includable in taxable income for the year 1959. (i) Nonsufficient fund checks. During the year 1961, petitioner charged off on its books and records and deducted a total of $6,550 for a nonsufficient funds check from one Audie Murphy in the amount of $5,000 and a nonsufficient funds check from one Miguel Yoftler in the amount of $1,550. The aggregate deduction in the amount of $6,550 for the year 1961 for checks cashed which were returned because of insufficient funds is not an allowable deduction because the account of Audie Murphy was collectible and the Yoftler check was paid on August 14, 1961. (j) General expenses. On its income tax return for the year 1961, petitioner claimed as general expenses the total amount of $102,200.76, *154 which respondent disallowed to the extent of $20,133.17. No amount in excess of $82,067.59 represented an ordinary and necessary business expense or was expended for the purpose indicated. General expenses claimed by petitioner on its 1961 return are as follows: 798 Expense
Claimed
Allowable
Disallowed
Legal and accounting
$15,611.97
$15,406.07
$ 205.00
Advertising
20,590.66
16,566.38
4,024.28
Bad debts
1,919.27
851.27
1,068.00
Business promotion
20,207.95
9,835.80
10,372.15
Insurance
25,318.01
24,449.01
869.00
Telephone
16,522.28
14,772.24
1,750.04
Travel 2,030.62
185.92
1,844.70
$102,200.76
$82,067.59
$20,133.17
As a part of the aforementioned (d) Operating Expenses, petitioner deducted "Salaries and Wages" during taxable years involved as follows: Year
Claimed
Allowable
Disallowed
1959
$187,551.76
$153,674.14
$ 33,877.62
1960
371,528.51
328,010.89
43,517.62
1961
351,081.18
242,839.41
108,241.77
During the taxable years involved herein, Hensley caused petitioner to place his relatives (son, daughter, and mother) and his girl friends on its payroll even though no services were *155 rendered by them to petitioner. Salary and payroll deductions claimed by petitioner for payments made to Peggy Nunley, Donna (Hensley) Menges, Ramona Reed, Gary Hensley, Jessie Hensley, and Sue Thompson in the years 1959, 1960, and 1961 are based upon false and fictitious records, as follows: 1959
1960
1961
Peggy Nunley
$1,472.00
$3,200.00
FICA contributions
36.00
96.00
Donna (Hensley) Menges
1,804.00
3,180.00
$1,080.00
FICA contributions
45.10
95.40
32.40
Ramona Reed (Myrl Penrod)
700.00
5,200.00
FICA contributions
21.00
144.00
Gary Hensley
1,600.00
5,900.00
FICA contributions
48.00
144.00
Jessie Hensley
1,190.00
FICA contributions
35.70
Sue Thompson
746.00
During 1959, 1960, and 1961, Hensley's daughter, Donna (Hensley) Menges, resided in another state outside of New Mexico and had other full-time employment. None of the friends and relatives on petitioner's payroll were licensed to work for petitioner as is required by the rules of the State Racing Commission of New Mexico. The payments to Sue Thompson in 1961 in the amount of $746, are, in reality, reimbursements for payments made by her on a *156 house for the benefit of Hensley. Also, as part of the aforementioned (d) Operating expenses, petitioner deducted on its income tax return as "Promotion" the following amounts: Year
Claimed
Allowable
Disallowed
1959
$ 850.09
$ 100.00
$ 750.09
1960
5,879.71
303.25
5,576.46
1961
20,207.95
9,835.80
10,372.15
Petitioner's general approach to promoting the racetrack was to encourage free publicity concerning the track in newspapers and magazines and over television and radio stations. Spending money for this purpose was regarded by petitioner's management as preferable to paid advertising because of the wide geographical area upon which it drew for bettors and horseowners. In the furtherance of this policy, petitioner made a practice of providing food, lodging, and entertainment for visitors engaged in radio, television, and newspaper work. It also induced various television and motion picture personalities and other celebrities to attend the racing meets. During the off-season, petitioner put on parties for members of the press at various cities in the Southwest. Entertainment was also provided to important horseowners, big bettors, and others *157 associated with the racing business, and Christmas gifts were regularly made to persons whose goodwill might help to promote the track. During the racing seasons of 1960 and 1961, Walton Ray Wiggins was in charge of the publicity department at Ruidoso. Wiggins carried liquor in his automobile and gave such liquor to 799 various individuals whose patronage would be beneficial to petitioner. As part of the aforementioned (d) Operating expenses, during the taxable years involved herein, petitioner claimed on its income tax returns as ordinary and necessary business expense, designated on its books and records as "Maintenance & Repairs," the following amounts, part of which respondent disallowed: Amount
Amount
Year
claimed
disallowed
1959
$57,587.50
$28,090.72
1960
58,097.62
43,641.73
1961
28,877.61
18,591.54
During each of the taxable years involved herein, the petitioner built certain improvements to its physical plant, and also made numerous repairs to existing structures. In doing so, it sometimes employed its own labor force. It also made use of various materials which were purchased in bulk but kept no clear record of what specific materials *158 were used for new construction as opposed to materials used for repair and maintenance of existing construction. During the taxable years 1959, 1960, and 1961, Robert H. Quick was in charge of construction at Ruidoso Downs. During these years he supervised the construction of several new buildings and substantial improvements to others, including three new wooden barns containing about 50 stalls in each building, construction of the Horseman's Cafe, a new guest house, and two large restrooms. Employees of petitioner assigned to a new construction project by Quick did not work on a particular building but would be assigned to other tasks at the racetrack in the course of a day or week. In 1959, petitioner's income tax return for 1957 was audited by the Internal Revenue Service and one of the principal issues was the capitalization of certain sums which had been expensed and treated as repairs and maintenance. The accountant who was then handling petitioner's affairs made a tentative arrangement to settle the matter but the proposed settlement was unacceptable to Hensley and to the attorney then acting for petitioner. As a consequence, petitioner and the accountant severed their *159 relationship and Martin F. Bednar (hereinafter sometimes called Bednar) was retained to handle the matter. Petitioner's liability for both 1957 and 1958 was settled by agreement with the sum of $26,000 being capitalized out of the maintenance and repairs account for each of those years. During the taxable years involved herein, petitioner carried a "Construction in Progress" (C.I.P.) account on its balance sheet. This account was an asset account representing the accumulated charges, both paid and accrued, which purportedly went into uncompleted new construction. It was not treated as subject to depreciation. When the construction project was completed, the item was removed from that account, placed in a property account, and depreciated. The office staff attempted as best they were able to obtain accurate information on what should be charged to this account. The information the staff received was usually sketchy or inconclusive. During the taxable years involved herein, Hensley used a series of subterfuges in order to cause petitioner to siphon off corporate funds for his own use and to decrease the corporate income tax payable to the Government. (a) Rental of house. During *160 1959 and 1960, Hensley caused petitioner to pay for the rental of a house and the utilities thereon for his son, Gary. Gary lived in the house until September 1960 when he returned to school in Phoenix. Rental expense deductions claimed by petitioner for these payments in 1959 and 1960 in the amounts of $750 and $75, respectively, were based upon false and fictitious records. Similarly, the utility deductions claimed by petitioner for payments made on behalf of Gary in 1959 and 1960 in the amounts of $301.87 and $294.75, respectively, were based upon false and fictitious records. (b) Payments on behalf of Hensley. During 1959 and 1960, payments were made for or on behalf of Hensley by petitioner which were charged to the following accounts and were based upon false and fictitious records. 1959
1960
Advertising
$6,420.58
Equipment rental and re- pairs
562.79
$ 72.28
Gas, oil and servicing
615.92
1,667.67
Management relations
91.03
Postage and freight
113.69
Promotion
361.69
1,087.18
Travel
279.77
931.49
Contract expense
5,000.00
The advertising deduction includes payments to Carl Mercer, which represented a loan (the contract expense *161 deduction is of a like nature), payments to restaurants frequented by Hensley's wife, and a payment to a photography studio for family 800 portraits. The equipment rental and repairs deduction is made up of payments for a set of tires and repairs on a 1958 and a 1960 Cadillac provided for Hensley's wife, who resided in Phoenix, Arizona. The gas, oil, and servicing deduction is made up of petitioner's payments to various gas companies and auto repair shops for repairs, supplies, and servicing on the automobiles owned by petitioner, but used in another state by his wife, and for gas and oil for the automobile of Hensley's girl friend. The management relations, postage and freight, promotion, and travel deductions are made up of additional payments to restaurants and night clubs frequented by Hensley's wife in Phoenix as well as for her personal traveling expenses (to Mexico, for example). (c) Bristow Pump Company. During the taxable years involved, Hensley also caused Ruidoso to make payments on his behalf and to prepare false invoices which falsely indicated payments by petitioner for rental of equipment and/or repairs. Hensley owned a parcel of real estate in Scottsdale, *162 Arizona. In 1959, he arranged to have a well drilled on the land and a pump installed. The cost of drilling the well was, at Hensley's request, billed to petitioner as 500 feet of 12-inch casing. Later, when it became necessary to deepen the well, the cost was billed to petitioner as 100 feet of 12-inch casing. Both of these bills were paid by petitioner. Hensley then arranged with Bristow Pump Company of Artesia, New Mexico, to have a pump installed in the well. Bristow was flown from New Mexico to Arizona in petitioner's airplane to perform the work at Hensley's home. The cost was $3,651.61. Hensley paid approximately $1,000 of this, but the balance was billed to petitioner at Hensley's request, with invoices indicating repairs to petitioner's existing pumping equipment. Bristow Pump actually did no work for petitioner at this time. In 1960, deductions for equipment rental and repairs in the amount of $2,472.62, and maintenance and repairs in the sum of $951.40 were claimed by Ruidoso for payments made to Bristow Pump Company. (d) Swimming pool. Another deduction for equipment rental and repairs was claimed by Ruidoso for payments made to Pool Construction Company for the *163 building of a swimming pool and related facilities at the Hensley residence in Phoenix, Arizona. Hensley arranged with Burton Pool of the Pool Construction Company, Oklahoma City, Oklahoma, to have a swimming pool installed and some paving work done at his home in Scottsdale, Arizona. Pool was not interested in handling it directly but undertook to handle it through subcontractors. Pool arranged with a swimming pool firm and a paving contractor, both located in Phoenix, Arizona, to do the work and ultimately paid them for it. At Hensley's request, Pool then billed his own charge of $12,077 to petitioner. This amount divided into 19 separate invoices, spread over a period of 3 months and indicated rental charges for equipment used in cleaning and straightening the channel at Ruidoso Downs. The invoices were regular on their face, described the equipment involved, the hourly charge, and the number of hours it was supposed to have used. Petitioner paid these invoices in 1960. In 1960, petitioner claimed deductions on its income tax returns for payments made to Pool Construction Company for maintenance and repairs in the total amount of $9,902. (e) Tropical Groves Nursery. In 1960, *164 petitioner claimed a deduction for supplies for a payment made to Tropical Groves Nursery, Phoenix, Arizona. This payment was made for trees, plants, and shrubbery for the Hensley residence in Phoenix. (f) Anderson-Farmer Motor Co. In 1960, petitioner likewise claimed a deduction for equipment rental and repair in the amount of $1,830.70 for alleged rental payments to Anderson-Farmer Motor Co. In 1960, Hensley was friendly with Myrl Penrod (also known as Ramona Reed). She was on Ruidoso's payroll and she and Hensley were married in 1962. In October 1960, she bought a 1961 Cadillac at Anderson-Farmer Motor Co. In addition to trading in her own car, the transaction required the payment of $1,830.70 in cash. At the instigation of Hensley, two false invoices were prepared on blank printed forms showing "Rental on 1-450 GMC Truck & 33 Ft. float from Sept. 15 to Oct. 15, 1960 at 30.00 per day - 900.00" and "Rental on 1-450 GMC Truck and 33 ft. float from Oct. 15 to Nov. 15, 1960 at 30.00 per day - 900.00." The additional $30.70 was paid for undercoating the Cadillac. The 801 invoices were not prepard by Anderson-Farmer Motor Company. These false invoices were paid by Ruidoso; the *165 payments were, in reality, made to pay for the net difference on the purchase of the automobile for Hensley's girl friend. (g) Gateway Motors, Inc. Hensley caused Ruidoso to purchase automobiles for himself and his family and friends, as well as to pay his personal indebtedness. During the years 1959 and 1960, Hensley caused false invoices to be submitted to Gateway Motors, Inc., for the alleged rental of automobiles. The payments were made to Gateway and deducted by petitioner as "equipment rental and repairs." In 1959 and 1960, deductions for equipment rental and repairs in the amounts of $3,994.35 and $4,967.33, respectively, were claimed by petitioner for alleged rental payments made to Gateway. No automobiles were ever rented to petitioner by Gateway; and no rental payments from petitioner were ever credited on the books of Gateway. Certain of the checks from petitioner payable to Gateway were not reflected on Gateway's books; but the checks were endorsed by Ray Smith, Gateway's bookkeeper, and taken directly to the American Bank, Carlsbad, New Mexico, and applied on a personal loan which Hensley had at this bank. For some time prior to 1959, Hensley was friendly with *166 Peggy Nunley. She traded in a 1952 or 1953 Pontiac to Gateway for a 1957 Chevrolet. The Chevrolet was then traded back to Gateway for a new 1957 Chevrolet. Later this car was traded in for a 1958 Buick; and subsequently the Buick was traded in for a 1959 Buick. Nunley paid no money to Gateway for any of these cars. In December of 1959, she sold the Buick and received a check for $3,400 from Gateway's bookkeeper, Ray Smith. She gave $2,500 of it to Hensley. Gateway also sold a car to Hensley's son, Gary, in 1959. Gary did not pay for it. During 1959 and 1960, Gateway carried accounts receivable in the names of Ray Reynolds and Dorothy Quick, employees of petitioner. These employees had no knowledge of such accounts or of the transactions relating thereto. Dorothy Quick charged only incidental repairs to her own car. The following checks of petitioner which were made payable to Gateway and deducted by petitioner as automobile rental expenses on its income tax returns for the years 1959 and 1960 were not credited to the books and records of Gateway as rental income. As mentioned hereinabove, certain of such checks were applied directly to loans of Hensley at the American Bank, Carlsbad, *167 New Mexico; and shortly after the issuance of the remaining checks, credits were made to accounts receivable of Gateway in the name of petitioner and of various individuals as hereinafter indicated: Check
no.
Amount
Disposition
5542
$194.10
Cr. American Bank
5827
194.10
Cr. American Bank
5955
194.10
Cr. American Bank
6144
194.10
Cr. American Bank
6404
194.10
Cr. American Bank
6464
194.10
Cr. American Bank
6587
194.10
Cr. American Bank
6668
194.10
Cr. American Bank
6807
194.10
Cr. American Bank
8027
194.10
Cr. American Bank
8198
194.10
Cr. American Bank
8378
194.10
Cr. American Bank
8524
453.00
Cr. American Bank
25.00
Cr. Gary Hensley account
8604
478.00
Cr. American Bank
8745
478.00
Cr. American Bank
8922
478.00
Cr. American Bank
9165
478.00
Cr. American Bank
9631
475.00
Cr. American Bank
(cash refund $3.00)
5103
351.00
Cr. Petitioner's account
5305
58.67
Cr. Ray Reynolds account
5413
560.00
Cr. Petitioner's account
5.00
Other
5471
425.98
Cr. Ray Reynolds account
5596
280.00
Cr. Petitioner's account
5735
280.00
Cr. Petitioner's account
5743
200.00
Cr. Dorothy Quick account
5784
100.00
Cr. Dorthy Quick account
5895
280.00
Cr. Petitioner's account
100.00
Cr. Dorothy Quick account
6952
650.83
Cr. Gary Hensley account
8477
478.00
Cr. Gary Hensley account
*168 During 1959 and 1960, the books of Gateway Motors reflected a credit balance in the account receivable in the name of petitioner. (h) Loans of Hensley. During 1960, petitioner wrote off as bad debts personal and/or false loans of Hensley in the aggregate amount of $4,350. These bad debt deductions claimed by petitioner were based upon false and fictitious records. (i) Depreciation. During the taxable years involved herein, petitioner claimed depreciation deductions on personal assets acquired by petitioner for or on behalf of Hensley. These depreciation deductions were based upon false and fictitious records as follows: 802 1959
1960
1961
Capitalized to
Air conditioner
$ 28.73
$ 57.46
$ 57.46
Cafe equipment
Well (Phoenix, Ariz.)
267.75
Construction in progress
Well deepening
50.00
100.00
Track equipment
1958 Cadillac
1,350.91
1960 Cadillac
266.78
3,067.96
(j) General Equipment and Border Machinery. In 1960, Hensley caused petitioner to claim deductions for payments to General Equipment Company, Inc., in the amount of $980, and to Border Machinery Company in the amount of $5,306. Hensley caused each of these *169 companies to submit false invoices to petitioner for the alleged rental of equipment. The payments, however, were for the outright purchase of the equipment, that is, a Speedline Scraper from General Equipment, and a Hough Payloader from Border Machinery. (k) Interest. In 1959, an interest deduction in the amount of $450 was claimed by petitioner. This deduction was based upon false and fictitious records. (1) Supplies. In 1960, petitioner claimed a deduction for supplies in the total amount of $632.52. This deduction was also based upon false Petitioner conceds Petitioner concedes that deductions which it claimed relating to Henery Well Drilling Company, Foley Plumbing & Heating Company, Pool Construction Company, Bristow Pump Company, Firestone Stores, Inc., Gambles, Tropical Groves Nursery, and totalizator costs are not ordinary and necessary business expenses; and admits that its records relating to claimed deductions involving Pool Construction Company, Henery Well Drilling Company, Bristow Pump Company and Gateway Motors are false and fictitious, and we so find. Accounting procedures. The petitioner maintained its books on an accrual basis of accounting. *170 Dorothy Quick was the office manager of petitioner during the taxable years involved herein. She handled the bills as they were delivered to Ruidoso. Bills received at the track office were opened by Dorothy Quick, or her assistant, checked, proofed for mathematical accuracy, and then placed in a "bills-to-pay" file with the supporting statement and invoices. The actual payment of all bills required the personal approval of Hensley. Either the office manager or one of the girls who worked in the office would take them to his office for that purpose. Except for the payroll account, Hensley personally signed all checks until some undisclosed time when a check writing machine was acquired. The printed form of check in use by the corporation during all of the years involved herein called only for the signature of Hensley as secretary-treasurer. The check form included a detachable voucher. In addition to typing on it a description of the payment, the office staff also designated on the voucher the account number to which the disbursement was to be charged. They were provided with a "chart of accounts" by petitioner's outside accountant which gave a numerical designation to the various *171 accounts, divided into departmental categories, such as Administration, Operating, and Mutuel. For 1959, there were more than 100 such separate designated accounts. Where the nature of the expenditures was obvious from the bill or when it was a kind which had become routine, the office staff would decide on the account numbers. In doubtful cases, they would ask Hensley. If a single check represented a disbursement for more than one kind of expenditure, the amount was broken down on the voucher and divided among the appropriate account numbers. When a bill had been paid and the appropriate entry made in the cash records, the responsibilities of the office staff in accounting for the transaction was considered completed. The actual posting of the figures to petitioner's general ledger accounts was done by outside accountants once a year after the close of the racing season. Outside accountants made an audit of petitioner's books at the end of each year and prepared its tax returns. For the years at issue herein, the work was done by Martin F. Bednar of Oklahoma City, Oklahoma. Hensley signed petitioner's income tax returns for 1959 and 1960. In the latter part of 1961, revenue *172 agent Spence began an investigation of petitioner's 803 1959 and 1960 income tax returns, contemporaneously with an examination of Hensley's returns. Agent Spence subsequently also audited petitioner's 1961 return. The original investigation of petitioner's returns was begun in January 1961, and continued until April 1962 by agent Spence when he was removed from the investigation. In connection with his investigations, agent Spence prepared numerous schedules showing adjustments to both petitioner's income and that of Hensley. The statutory notice of deficiency herein was not issued with respect to this examination by agent Spence. In the latter part of 1966, agent Spence was indicted, tried, and convicted of soliciting and accepting a bribe in an unrelated tax case. After April 1962, special agent Reynolds was assigned to the investigation of petitioner. Agent Reynolds and agent McKown made a detailed examination of the adjustments made by agent Spence with some additional investigation, including an examination of various physical assets at Ruidoso Downs. On February 1, 1962, some months after agent Spence began his audit, petitioner's board of directors held a special meeting *173 for the purpose of considering "the proposed adjustments relating to corporation income tax returns filed for the years 1959 and 1960, now the subject of investigation of the Internal Revenue Service." The meeting was attended by petitioner's attorney as well as the three directors and some of the revenue agent's contentions were discussed. The president also reported the contention of some minority stockholders that petitioner had made certain expenditures which were not proper corporate business expenses and he indicated that they might be expected to attempt to recover them. On April 21, 1962, following the annual stockholder's meeting, Derrick was again elected president, Taylor was elected vice president, and Hensley was elected secretary, but he was not elected treasurer and that office was temporarily left vacant. Because Spence's adjustments appeared to reveal misconduct on the part of Hensley, Martin F. Bednar was retained by the board of directors to make a detailed audit of petitioner's books for 1961. At the next director's meeting on May 12, 1962, at which Bednar was present, Hensley resigned as an officer and director, giving as his reason the pending tax investigation. *174 Bednar explained his tentative audit report for 1961 and indicated that while he had assured the revenue agent that a "clean" return would be filed for 1961 and that "he had endeavored to eliminate any nondeductible items, still there was nothing that he could do about fictitious invoices" in that year. Bednar also advised the board of his audit of Hensley's personal account, indicating that he had charged Hensley with items totaling $61,269.77, including $37,516.62 which had been charged to various other corporate accounts in prior years. Petitioner's 1961 income tax return was filed on July 15, 1962. In the preparation of this return, $8,546.33 of expenses were treated as nondeductible and charged to surplus. Certain automobiles were eliminated from the depreciation schedule and certain other automobiles, a payloader and a land leveller were added on the grounds that petitioner had acquired ownership of these assets. About $11,768.58 in various charges were removed from expense accounts and charged to Hensley personally, including certain salaries paid to his two children and his mother, personal clothing and laundry, and automobile expenses and meals for his wife. In 1962, a *175 group of minority stockholders brought a derivative suit against Hensley in the New Mexico District Court. It was settled, pursuant to a stipulation, by a judgment entered August 13, 1963, which provided, inter alia, that Hensley was not to serve as a director of petitioner or have any executive or managerial post except that, for a reasonable salary, the board would hire him to arrange the races, handle publicity, and deal with horseowners and the press. He was prohibited from dealing with corporate funds in any manner. In addition, Hensley and his ex-wife (divorced in January 1963) were each to turn in to the petitioner 500 shares of its capital stock in exchange for a complete release from all claims by the petitioner, including any claims that might arise out of the pending tax investigation. As a result of their divorce, Hensley and his wife entered into an agreement on January 20, 1963, settling their various property rights and agreeing to try to sell their stock in petitioner within 6 months. They did not sell their stock, however, until 1969. Under the terms of the agreement for sale to Newco Industries, if the ultimate liability resulting from this case, including interest, *176 should exceed $325,000, 804 the sellers were obliged to reimburse the buyer in the proportion that their stock bore to the total outstanding. After settlement of the minority stockholder's suit in August 1963, petitioner continued to employ Hensley at Ruidoso. On January 15, 1965, following the annual meeting of the stockholders of Ruidoso, the board of directors held their meeting at which the board voted unanimously to renew Hensley's employment by Ruidoso "for a period of one year upon the same terms and conditions as his employment contract for 1964." On December 20, 1965, a board of directors meeting was held at which Hensley was present and the members of the board discussed Ruidoso's "problems." It was decided, among other things, that: Mr. Gene Hensley, who has devoted many years to the growth and promotion of the Ruidoso Racing Association, and due to many reasons, should take a year's leave of absence and be completely relieved of all responsibility and duties in connection with Ruidoso Racing Association, and that during this leave of absence he would receive $1,500.00 per month compensation to serve as consultant to the Board of Directors. This leave of absence *177 to begin January 1, 1966 and terminate December 31, 1966. And, it was also recognized by the Board of Directors that Mr. Hensley has been of great service in the past to the Ruidoso Racing Association and in appreciation this Board voted to furnish Mr. Hensley with a rental car in the Pontiac-Oldsmobile 98 class, and that Mr. Hensley pay all expenses incurred. This action was discussed thoroughly with Mr. Hensley and each member of the Board of Directors, and Mr. Hensley was in complete agreement. Having gone into this reorganization with Mr. Hensley, it was further agreed, until such time as a change is made by the Board, that all bills, other than normal current expenses be held for approval by the Board. Mr. Melvin Neal of the firm of Neal and Neal, Attorneys, was contacted and approved all measures. On January 6, 1967, Hensley was convicted after trial by a jury in the United States District Court for the District of New Mexico on four counts of income tax evasion with respect to his personal income tax returns in violation of 26 U.S.C. sec. 7201 and on four counts of making and subscribing false returns with respect to petitioner in violation of 26 U.S.C. sec. 7206 *178 (1). The counts were founded on the 1959 and 1960 returns of Hensley and Ruidoso Racing Association. The case against Hensley was proved by the "specific items" method in which over 300 exhibits were introduced by the Government. These exhibits which for the most part were stipulated, together with the testimony of the corporation suppliers (all of which are incorporated by stipulation in the instant case), were used to show that invoices which on their face appeared to be legitimate charges against Ruidoso were actually false invoices, solicited by Hensley from the corporation suppliers in order to disguise payments made by Ruidoso to friends and relatives of Hensley. On December 15, 1967, respondent mailed the statutory notice of deficiency involved herein. In 1969, when Hensley and his divorced wife sold their Ruidoso stock to Newco Industries, the buyer acquired sufficient additional stock from other owners so that at the time of the instant trial, it owned approximately 90 percent of the stock outstanding, the balance being held by some 16 other stockholders. On June 4, 1969, a separate long-term "Employment Agreement" [2] was entered into between Eric Culver, who represented *179 the Newco Industries group (subsequently Newco Corporation), and Eugene V. Hensley's family owned corporation, Sierra Blanca Sales Company. This employment agreement reads, in pertinent part, as follows: Employment and Duties 1. All American shall hire Sierra Blanca to perform the services mentioned herein. The services to be rendered by Sierra Blanca consist of securing entries for horse sales of any and all kinds presently being conducted by All American, or in the future and during the term of this contract conducted by All American or Ruidoso Racing Association, Inc., promoting buyer and seller interest in such sales, assisting in the conduct thereof, if requested by All American or Ruidoso 805 Racing Association, Inc., or the successor of either, and the rendering of expert consultation upon request with respect to racing and horse sales. Sierra Blanca shall not have authority to bind All American or Ruidoso Racing Association, Inc., or the successors of either, by virtue of this Agreement and will enter into no contracts or commitments in behalf of either such corporations without a specific direction and authority in writing from such corporation. *180 Performance 2. Sierra Blanca agrees to devote so much time and effort to the performance of the duties mentioned in the preceding paragraph as are reasonably necessary to carry out such duties. Term 3. The term of this Agreement shall be fifteen (15) years from July 1, 1969, subject to Sierra Blanca's performing its duties hereunder. Compensation 4. Sierra Blanca shall be paid compensation for services rendered hereunder in the amount of $15,000.00 per year, payable $1,250.00 per month beginning July 5, 1969, during the term of its performance under the Agreement. Status 5. The parties stipulate that the status of Sierra Blanca is solely that of an independent contractor. Non-Competition 6. None of the original stockholders will compete with All American, Ruidoso Racing Association, Inc., or the successors of either, in the business of racing and horse sales and any other related business for the fifteen (15) year period of this Agreement in the geographic area in which either corporation or its successor operates, directly or indirectly, as an agent, employee, stockholder, partner or otherwise, nor will it perform similar services during such period for any *181 other person. Effect of Waiver 7. The waiver by either party of a breach of any provision of this Agreement in the geographic area in which a waiver of any subsequent breach thereof. Assignment 8. The rights and benefits of All American under this Agreement shall be transferable by it, or a subsequent transferee, and all covenants and agreements hereunder shall inure to the benefit of, and be binding upon, the successors and assigns of the parties. The rights, benefits and obligation shall be binding upon Ruidoso Racing Association and its successors and assigns. Guarantee 9. Eric N. Culver personally guarantees that he will cause the terms of this agreement to be entered into between All American Livestock Sales Company and Ruidoso Racing Association, Inc., immediately upon assuming an executive position with both All American Livestock Sales Company and Ruidoso Racing Association, Inc.
IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written. This employment agreement was executed as part of the consideration paid Eugene V. Hensley for selling his majority stock interest in petitioner to the group headed by Eric Culver. *182 The books and records of petitioner reflected the following payments made to Sierra Blanca Sales Company pursuant to the employment agreement: Check No.
Date
Check issued to
Amount
Petitioner's account charged
28148
8/12/69
Sierra Blanca, Inc.
$1,250
General Operating Expense
28390
9/10/69
Sierra Blanca, Inc.
1,250
General Operating Expense
28535
10/ 2/69
Sierra Blanca Sales Co.
1,250
Advertising
28632
11/ 4/69
Sierra Blanca Sales Co.
1,250
All American Sales Expense or Billboard Expense
28738
12/19/69
Sierra Blanca Sales Co.
1,250
All American Sales Expense or Billboard Expense
28762
1/23/70
Sierra Blanca Sales Co.
1,250
All American Sales Expense or Billboard Expense
28866
2/10/70
Sierra Blanca Sales Co.
1,250
All American Sales Expense or Billboard Expense
28965
3/ 6/70
Sierra Blanca Sales Co.
1,250
All American Sales Expense or Billboard Expense These payments were, in fact, made pursuant to the employment agreement. Opinion Issue 1. Adjustments to petitioners income for the taxable years 1959, 1960, and 1961. 806 During the taxable years 1959 through 1961, inclusive, petitioner-corporation maintained *183 and operated a racetrack (Ruidoso Downs) in New Mexico; and its majority stockholder and chief executive officer was Eugene V. Hensley. As director of racing and secretary-treasurer, he formulated policy, maintained complete control of the corporation's records, and ran the corporation's day-to-day business. In 1967, Hensley was convicted for evasion of his own income tax and for making and subscribing false returns for petitioner in the years 1959 and 1960. The evidence in the criminal trial established that invoices which on their face appeared to be legitimate charges against petitioner were actually false invoices solicited by Hensley from corporation suppliers in order to disguise payments made by petitioner to friends and relatives of Hensley. In addition to using petitioner's funds for his personal benefit, Hensley caused the petitioner to expense various capital assets. Respondent determined that petitioner had unreported income and unallowable deductions during the taxable years 1959, 1960, and 1961 which resulted in deficiencies in the amounts of $118,758.88, $150,055.09, and $148,295.58, respectively. The particular adjustments made to petitioner's income in the notice *184 of deficiency for this period are set forth in our Findings of Fact and include, inter alia, income from bar and food sales; operating and administrative expenses; airplane expenses; and deferred credits. Totals of the particular adjustments are made up of literally hundreds of small items determined through an exhaustive examination of petitioner's books and records. Included in the pleadings as Exhibits 1, 2, and 3 to respondent's amendment to answer are voluminous schedules containing transcriptions and/or partial transcriptions of petitioner's books and records relating to certain expense accounts from which petitioner's 1959, 1960, and 1961 income tax returns were prepared, along with respondent's analysis of such expense accounts relating to his adjustments as set forth in the statutory notice. These schedules, along with the schedules attached to the notice of deficiency, contain particulars on all of the adjustments made in the notice of deficiency. Subject to the effect of adjusting journal entries made by petitioner's accountant, all of the specific disbursements disallowed by respondent, as set forth in Exhibits 1, 2, and 3, were claimed as deductions by petitioner on *185 its 1959, 1960, and 1961 income tax returns, except that petitioner denies that the amounts relating to labor for the Horseman's Cafe were so deducted. Petitioner, relying on Helvering v. Taylor, 293 U.S. 507 (1935), affirming 70 F. 2d 619 (C.A. 2, 1934), contends that the statutory notice is arbitrary and capricious and that upon a showing sufficient to satisfy the Court thereof, petitioner will have discharged its burden of proof irrespective of any fraud issue. Essentially, it is petitioner's position that the contents of the statutory notice are based on the audit of former revenue agent Spence, and that the audit was designed primarily as a means of extracting a bribe from petitioner or its officers rather than the determination of petitioner's correct taxable income. In the same vein, petitioner argues that because of the errant conduct of Spence, who was assigned to the initial investigation of petitioner and Hensley, the notice of deficiency is "corrupt," and consequently, the burden of proof on all substantive issues rests with respondent. Moreover, petitioner at the outset of the instant trial, referring to the numerous individual adjustments *186 made by respondent in determining the deficiency herein, informed the Court that petitioner did not intend to audit the books and records of the taxpayer, and that it would "not go through all of these hundreds upon hundreds of items and attempt to establish each one of them; even if it were feasible to do so, which it is not." We find no merit in petitioner's position. A determination of tax liability made by respondent is presumptively correct; the taxpayer, having invoked the jurisdiction of this Court, has the onus of demonstrating by a preponderance of the evidence that respondent's determination with respect to each item underlying such determination is erroneous or that respondent's determination was arbitrary or invalid. Anderson v. Commissioner, 250 F. 2d 242, 246 (C.A. 5, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U.S. 950. Moreover, it is recognized that respondent in the exercise of his judgment in making his statutory determination, may properly place the burden on the taxpayer of establishing all of the elements upon *187 which petitioner's contentions are based. 807 See Burnet v. Houston, 283 U.S. 223 (1931). Merely because the taxpayer's task is seemingly difficult or time consuming does not relieve him of his burden. If the rule were otherwise, we would find it necessary to invalidate every determination which involved voluminous adjustments or relieve the taxpayer of his burden of proof. Such a view would emasculate the well established rules relating to the burden of proof and seriously undermine the effect of the statutory notice upon which the principle of the burden of proof is found in the usual situation. We find no merit in petitioner's contention that the notice of deficiency was arbitrary and excessive and "was not based on a good faith examination of petitioner's affairs." Suffice it to say there is nothing in the record to show that the statutory notice is in any way the product of a corrupt agent. Special agent Reynolds was in complete charge of the investigation of Ruidoso, and petitioner does not charge any impropriety, oppression, or corruption on his part against petitioner. Our analysis of the record convinces us that a thorough and exhaustive investigation *188 forms the basis of respondent's determinations in the notice of deficiency. Kenneth L. McKown, the agent who succeeded Spence in his examination of petitioner and who prepared the revenue agent's report herein, testified that he made an independent investigation of the items involved in the deficiency notice; visited Ruidoso Downs to personally view some of the assets in dispute; and after consultation with agent Reynolds applied his best judgment to each item. The fact that McKown may have come to the same conclusions as Spence as to some of the adjustments comprising the determinations against petitioner or may have accepted Spence's figures with respect to several items does not alter our view. More importantly, it is respondent who ultimately made the determinations involved herein and who issued the statutory notice. See Henry Wilson, 16 B.T.A. 1280, 1285 (1929); Jacob F. Brown, 18 B.T.A. 859, 866-867 (1930), certiorari denied 286 U.S. 556 (1932). See also Hensley v. United States, 406 F. 2d 481 (C.A. 10, 1968), affirming the conviction of Eugene V. Hensley, where the Court of Appeals rejected the argument that Spence's *189 participation in the investigation of Hensley so tainted the prosecution as to deny application of due process. [3]
*190 Petitioner (in its trial brief) contests all of the adjustments made by respondent except for some so-called minor adjustments (viz., $1,830.70 paid to Anderson-Farmer) but advised the Court that it would not be able to offer evidence on all of them and, therefore, must rest its case respecting the deficiencies involved on our decision regarding the burden of proof. Although petitioner maintains that the task of presenting all of the evidence necessary to sustain the deductibility of the voluminous expenditures in controversy would be "simply impossible," petitioner introduced several witnesses in the instant proceeding in an endeavor to show error in respondent's determination with regard to several of the accounts maintained by petitioner, such as "Promotion" and Maintenance & Repair." As to the account designated "Promotion" during the taxable years 1959, 1960, and 1961, petitioner claimed total business promotion expenditures in the respective amounts of $850.09, $5,879.71, and $20,207.95, of which respondent disallowed $750.09, $5,576.46, and $10,372.15, respectively, as not being ordinary and necessary business expenses incurred by petitioner during that period. It is petitioner's *191 position that all of the amounts claimed were expended to attract the patronage of important personalities in the entertainment field and the favorable support of the press. Walton Ray Wiggins, who was in charge of the publicity department at 808 Ruidoso during the racing seasons of 1960 and 1961, testified that various movie and television celebrities and members of the press were entertained by petitioner at Ruidoso Downs and other cities (El Paso, Texas, and Oklahoma City, Oklahoma), and that gifts, including bottles of liquor, were given to such individuals in order to promote patronage of its track. While we do not doubt Wiggins' testimony that petitioner treated its guests generously, there is no affirmative evidence before us to warrant deductions for business promotion greater than those allowed by respondent. Consequently, respondent's determination will not be disturbed as to this account. The record also shows that during the taxable years 1959, 1960, and 1961, petitioner claimed as ordinary and necessary business expenses an account designated "Maintenance & Repairs" in the respective amounts of $57,587.50, $58,097.62, and $28,877.61 of which respondent disallowed *192 $28,090.72, $43,641.73, and $18,591.54, respectively. It is respondent's position that the amounts disallowed were in fact spent on capital improvements at petitioner's racetrack. However, petitioner avers that its methods in allocating these expenditures between capital improvements or assets and repairs was reasonable and should not be disturbed. In support of its position that the aforementioned amounts claimed were spent for ordinary and necessary expenses or routine upkeep of the racetrack facilities, Robert H. Quick, in charge of construction at Ruidoso Downs during the taxable years involved, testified that he endeavored to keep expenses relating to new construction and repairs separate. In this connection he testified that he always kept a time book in which he recorded the time spent on a particular construction job; that he marked all bills for material so that each invoice was designated as "new construction" or "repair"; and that every week when he turned his payroll in, he would indicate thereon the amount of labor spent for new construction and on repairs. Apart from Quick's general testimony in this regard, petitioner did not adduce any documentary evidence, such *193 as the time book, payroll record, or bills referred to by him to substantiate the allocations allegedly made on the "maintenance and repairs" and "new construction" during the taxable years involved. It is clear from Quick's testimony that during the years in question, he supervised the construction at Ruidoso Downs of several new buildings and substantial improvements to others, including three wooden barns containing about 50 stalls in each building, the Horseman's Cafe, a new guest house, and two large lavatories. Agent McKown testified that he made an independent investigation of this account (Maintenance & Repairs) in order to ascertain whether or not 75 percent of the amount spent for building material should be capitalized. After conferring with special agent Reynolds as to the result of their interviews with witnesses who were familiar with construction and repairs at Ruidoso, including a personal examination of the Ruidoso racetrack, he was of the opinion that the adjustment of this account was as accurate as they could calculate under the circumstances. Considering the meager evidence presented on this issue, we do not believe that petitioner kept adequate or accurate records *194 reflecting the cost of new work in progress or capital improvements as opposed to ordinary and necessary expenses for repairs during the years involved. Since petitioner has not met its burden of proof, respondent's determination in this respect is sustained. Respondent determined that all of petitioner's sales of alcoholic and nonalcoholic beverages were not reported on its books or records or reported on its returns for the years 1959, 1960, and 1961 in the respective amounts of $73,894.78, $90,340.20, and $71,334.26. Respondent's method of computing the corrected sales is set forth fully in our Findings. Petitioner contests respondent's adjustment of "bar and food sales" in its entirety on the ground that the "evidence will not support the method of computation used nor the amounts" determined by respondent. Apart from this broad statement, petitioner has not adduced any convincing evidence to show error in respondent's calculation of the account in question, and therefore we sustain respondent on this item. Petitioner also challenges respondent's adjustments relating to certain unreported income and unallowable deductions claimed for the taxable years involved herein, including *195 purchases, loss on sale of a 1958 Cadillac, operating expenses, administrative expenses, airplane expenses, deferred credits, reserve for unclaimed tickets, nonsufficient fund checks, and general expenses. The specific amounts of these adjustments and 809 the underlying facts relating thereto are set forth in extenso in our Findings. On the basis of these adjustments, respondent determined the deficiencies in income tax for the period involved herein. Petitioner has conceded that certain of these deductions which it claimed on its returns were not ordinary and necessary expenses; and that its records relating to other deductions such as Pool Construction Company, Henery Well Drilling Company, Bristow Pump Company, and Gateway Motors are false and fictitious. With respect to other adjustments mentioned hereinabove, petitioner averred in its trial brief that it would not be able to offer evidence to refute respondent's position. Suffice it to say no affirmative evidence was introduced by petitioner in the instant proceeding to show any error in respondent's adjustments of unreported income and unallowable deductions for the years in question. In view of the foregoing, and the record *196 as a whole, we hold that petitioner has failed to demonstrate error in respondent's determination of deficiencies for the taxable years involved herein, and accordingly the respondent is sustained. Issue 2. Fraud We turn now to the question whether or not a part of the underpayments due from petitioner for each of the years 1959 through 1961, inclusive, was due to fraud with intent to evade tax within the purview of section 6653(b) of the 1954 Code. Correlative to this question is the pivotal issue of whether the fraudulent conduct of Eugene V. Hensley, principal and dominant stockholder-officer of petitioner during the taxable period involved, can be properly imputed to petitioner. The burden of proof with respect to fraud is upon respondent and he must establish fraud on the part of petitioner for each taxable year involved by clear and convincing evidence. Baumgardner v. Commissioner, 251 F. 2d 311 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court. In sustaining his burden of proof, respondent is not required to prove the precise amount of the underpayment *197 resulting from fraud, but only that "any part" of the underpayment is attributable thereto. See Estate of W. Y. Brame, 25 T.C. 824 (1956), affd. per curiam 256 F. 2d 343 (C.A. 5, 1958). Our conclusions with respect to the issue of fraud for the taxable years 1959 through 1961 are based upon a consideration of the entire record properly before us and we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia 22 T.C. 1002, 1014 (1954); Wallace H. Petit, 10 T.C. 1253, 1257 (1948). We also recognize that in this, as in many fraud cases, proof of fraud, if it is to be established, must depend in some respects upon circumstantial evidence. Fraudulent intent can seldem be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and reasonable inferences properly to be drawn therefrom. Helvering v. Mitchell, 303 U.S. 391 (1938), affirming 32 B.T.A. 1093 (1935); M. Rea Gano, 19 B.T.A. 518, 552 (1930). We are *198 mindful that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our Findings on that basis. We have held that a mere understatement of income does not establish fraud. James Nicholson, 32 B.T.A. 977, 989 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. Respondent contends that the fraudulent conduct of Hensley, principal stockholder of Ruidoso during the years 1959, 1960, and 1961, is imputable to petitioner and hence, the latter is liable for the addition to tax for fraud under section 6653(b), supra. Respondent particularly refers to Hensley's position as director of racing which made him the unlimited agent of petitioner and to the substantial benefits received by petitioner through the efforts of its "alter ego," Hensley. Although petitioner does not dispute that certain depredations of Hensley, *199 with respect to Ruidoso's financial affairs may properly be held as fraudulent under the statute, it maintains that no such fraud can be charged to the corporate entity since the wrongful acts involved were committed by Hensley outside the scope of his official duties with the corporation and solely for his personal gain. In essence, 810 petitioner argues that it had a "strong minority" of stockholders who, as soon as they became aware of what peculations had occurred, took legal action to protect their interest, and therefore the corporation cannot be charged with the wholly unauthorized acts of Hensley. We believe that petitioner's position is without merit. It is well settled in the Federal laws that a corporation can act only through its officers, employees, and agents and that therefore their intentions must be imputed to the corporation. A corporation does not escape responsibility for the acts of its duly authorized officers who have performed wrongfully in that capacity. Corporate fraud necessarily depends upon the fraudulent intent of the corporate officers. Otherwise, it would *200 be quite difficult, if not impossible, to determine that fraud had been committed by a corporation, although it cannot be doubted that a corporation is capable of committing fraud. 10 Fletcher on Corporations, Per. Ed., 384. Irving S. Federbush, 34 T.C. 740, 749 (1960), affd. 325 F. 2d 1 (C.A. 2, 1963); Ace Tool & Eng., Inc., 22 T.C. 833, 843 (1954); George Still, Inc., 19 T.C. 1072, 1077 (1953), affd. per curiam 218 F. 2d 639 (C.A. 2, 1955); Saven Corp., 45 B.T.A. 343, 355 (1941); Summerill Tubing Co., 36 B.T.A. 347 (1937); L. Schepp Co., 25 B.T.A. 419, 438-441 (1932). To this effect, see Elmer J. Benes, 42 T.C. 358 (1964), affd. 355 F. 2d 929 (C.A. 6, 1966), where we stated at p. 382: Where fraud is alleged against a corporate taxpayer, the requisite proof of fraudulent intent is to be found in the acts of its officers, inasmuch as the corporation, being an artificial person created by law, can have no separate intent of its own apart from those *201 who direct its affairs. Where the dominant stockholder-officer diverts corporate funds for his own use and also on behalf of, and not against the pecuniary interest of the corporation, such action is not considered to be antagonistic to the corporation. In such circumstances, we have held that the consequences of the malefactor's acts were intended by him to be in behalf of the corporation and the necessary corporate fraud was accordingly present when the incorrect income tax return was filed. Auerbach Shoe Company v. Commissioner, 216 F. 2d 693, 697-698 (C.A. 1, 1954), affirming 21 T.C. 191, 194 (1953); United Mercantile Agencies, Inc., 23 T.C. 1105, 112-114 (1955). See also Botwinik Brothers of Mass., Inc., 39 T.C. 988 (1963), where the malefactor-stockholder was a minority stockholder whose interests were antagonistic or adverse to those of the corporation and the majority stockholders. After analyzing all of the evidence in this case, bearing in mind the above-stated principles, we are convinced that the corporation's returns for the taxable years 1959, 1960, and 1961 were fraudulently filed with the intention of avoiding *202 tax, and that in each of such years a part of each underpayment here involved was due to the fraud of petitioner with intent to avoid taxes on its part. Petitioner's underpayments for the years in controversy did not result from the ultra vires acts of a stockholder, as it contends, but was due to its evasion of its obligation and duty to account for and report its total income. The affirmative evidence of intentional wrongdoing in the instant case is by no means meager or equivocal. Bearing in mind that the intent to evade taxes must be found for each taxable year involved before the addition to tax for fraud for that particular year can be sustained, we turn our attention to consider the indicia of fraud in the years before us. Initially, we must reject petitioner's suggestion that Hensley was not the majority stockholder and chief executive officer of Ruidoso during the years under review. During this period he owned some 5,025 shares out of a total outstanding 7,992 shares of Ruidoso's stock, representing 62.8 percent ownership. Included in this 5,025 shares of stock was 1,810 shares of stock allegedly pledged on a loan with the First National Bank of Artesia, New Mexico, and *203 50 shares in the name of James Derrick. We are satisfied that the 1,810 shares, allegedly pledged as security for a loan during 1959 and 1960, never left Hensley's dominion and control. He voted these shares during these years and received and reported the dividends paid on these shares. Apparently, he "pledged" these shares for the sole purpose of misleading the State Racing Commissioner of New Mexico who had required that he diminish his stockholdings in petitioner to 40 percent. As for the 50 shares, we believe that these shares were actually owned by 811 Hensley. Indeed, Hensley admitted owning 65 percent of Ruidoso stock during a board of director's meeting and in his deposition taken in the instant trial of owning 69 percent of the stock. [4]
*204 In addition to the majority shares owned by Hensley during the years before us, he also voted by proxy additional shares, so that his effective stock control of Ruidoso was approximately 70 to 75 percent. Apart from being majority stockholder, an officer, and director of petitioner, he was designated director of racing and according to Article IV, Section 6 of the corporate by-laws, this position provided for "the authority of a general agent, without limitation" to act for the corporation in many important matters, which Hensley exercised to the fullest extent. In our view during the taxable years involved, Hensley wielded almost unlimited control and domination of Ruidoso. The testimony of petitioner's office manager, Dorothy Quick and its two accountants, Shelby C. Hogan and Martin F. Bednar, shows that Hensley did, in fact, control the day-to-day business operations of petitioner, including the supervision of petitioner's records. In this connection, we note that Hensley signed the income tax returns filed by petitioner during the taxable years 1959 and 1960. The affirmative evidence of fraud on Hensley's part while directing petitioner's affairs is overwhelming. The record *205 is replete with transactions showing the misappropriations of Hensley and the surreptitious methods he employed to siphon off corporate funds for his personal use and to decrease his and petitioner's income tax. We have considered the record in the criminal tax case against Hensley for the taxable years 1959 and 1960, including the testimony of all witnesses, [5] and the conclusion is inescapable that Hensley caused petitioner to claim false deductions on its income tax returns during the years in question through the use of fictitious and fraudulent records. *206 It would serve no useful purpose here to reiterate all of the evidence of fraud in the record which sustains our conclusion that respondent has met his burden of establishing by clear and convincing evidence that Hensley knowingly and intentionally avoided the payment of his taxes and that of petitioner during the taxable years 1959 through 1961, inclusive. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. During the years 1959, 1960, and 1961, Hensley caused the petitioner to place his relatives (son, daughter, and mother) and his girl friends on its payroll even though no services were rendered by them to petitioner. Hensley admitted that he improperly put his family on Ruidoso's payroll. [6] Undoubtedly these deductions taken by petitioner were fraudulent. Similarly in 1959, deductions were claimed by petitioner for interest paid on a personal loan of Hensley. And in that year, Ruidoso also claimed a loss on a 1958 Cadillac which was used by Hensley's wife for her own benefit in Phoenix. Likewise, Hensley caused petitioner to pay for the rental of a house for his son, Gary, along with the utilities on this *207 house. Gary lived in this house during the racing season of 1959 and 1960. He testified that he lived there until September 1960 when he returned to school in Phoenix and that he continued to receive a salary check from Ruidoso. [7] It is clear that the 812 aforementioned deductions so charged served to reduce considerably in each of the taxable years involved the profits which petitioner reported on its income tax returns. *208 Additional evidence of fraud on the part of Ruidoso is reflected in the payments made for or on behalf of Hensley which were charged to various accounts of petitioner, including, inter alia, advertising, equipment rental and repairs, gas, oil and servicing, management relations, postage and freight, promotion, travel, and contract expense. The practice of charging personal items of a majority stockholder to corporate business expense has been held to warrant the imposition upon a corporatepetitioner of additions to tax for fraud. Elmer J. Benes, supra, 382-38. The record also shows that during 1960, petitioner wrote off as bad debts, personal loans of Hensley. The loans were, in fact, personal loans made by Hensley which he caused petitioner to assume, and then write off. In one instance, the alleged recipient of the purported loans denied ever having received such a loan from Hensley or anyone else. Further indicia of fraud on the part of Ruidoso is found in the fact that Hensley caused it to depreciate assets which while purchased by petitioner were actually used by his wife and his girl friend. Thus, an air conditioner was bought for Peggy Nunley and installed *209 in her house. Also, a well was dug at the Hensley residence in Phoenix which was occupied by Mrs. Hensley. Likewise Hensley caused petitioner to buy a 1958 and a 1960 Cadillac which were used exclusively by Mrs. Hensley. All of these assets were depreciated by petitioner. We also note that the air conditioner was capitalized as cafe equipment and that Hensley caused the well digger to submit false invoices to petitioner for the cost of the casing material used in the well. We also believe that the deductions claimed by Ruidoso for payments made to Bristow Pump Company (for equipment rental and maintenance and repairs) constitute significant evidence of fraud on the part of petitioner. Bristow testified that these charges were for work done by him at the Hensley residence in Phoenix, and that he prepared false invoices at the instigation of Hensley. Another improper deduction for equipment rental and repairs was claimed by Ruidoso for payments made to Pool Construction Company for the building of a swimming pool at the Hensley residence in Phoenix. Pool also prepared false invoices at the instigation of Hensley. Similarly, Ruidoso claimed as an equipment rental and repair deduction *210 three payments made in 1960 to Anderson-Farmer Motor Company. False invoices were prepared at Hensley's instigation billing petitioner for rental on a truck and 33-foot float in the total amount of $1,830.70. This payment was, in reality, made to pay for the net difference on the purchase of a 1961 Cadillac for Hensley's girl friend, Myrl Penrod, also known as Ramona Reed. Also in 1960, petitioner claimed a deduction for supplies for a payment made to Tropical Groves Nursery, Phoenix, Arizona. This payment was actually made for trees and shrubbery at Hensley's residence in Phoenix. Other fraudulent deductions were claimed by Ruidoso during the years in question relating to the airplane owned by petitioner. Petitioner's accountant during 1959, testified that he was of the opinion that the airplane was used about 50 percent for petitioner's business, but he showed the airplane expense as deductible in its entirety on petitioner's records because of the insistence of "management." This record reeks with evidence of fraud on the part of Hensley. Probably the most elaborate scheme on his part relates to the payments made to Gateway Motors and deducted by Ruidoso as equipment rental *211 and repairs. As in other instances mentioned hereinabove, Hensley caused false invoices to be submitted to petitioner for the alleged rental of automobiles. As set forth in our Findings in detail, this subterfuge was used by Hensley to purchase automobiles for himself and his family and friends as well as to pay his personal indebtedness. Although the record shows that Hensley used petitioner as his own "personal bank account," not all of the fraudulent deductions claimed by petitioner in the taxable years under review related to payments made to or on behalf of Hensley. In 1960, deductions were claimed for payments to General Equipment Company, Inc., and to Border Machinery Company; and Hensley 813 caused each of these firms to submit false invoices to petitioner for the alleged rental of equipment. Yet the evidence is clear that the payments were for the outright purchase of a Speedline Scraper from General Equipment and a Hough Payloader from Border Machinery. In our opinion, this is a flagrant example of petitioner's expensing of items that should have been capitalized and constitutes material evidence of fraud. We also find that substantial deductions were claimed relating *212 to the expensing of building supplies and labor used in the construction of petitioner's physical plant, which should have been capitalized, and other items of the same nature as those relating to General Equipment and Border Machinery. Manifestly, these improper deductions directly benefited petitioner and were not antagonistic to the financial interest of the minority stockholders. See Botwinik Brothers of Mass., Inc., supra, 997. Indeed, petitioner prospered under Hensley's direction, its plant grew three or fourfold, and its volume of business increased substantially. It is noteworthy that after respondent's investigation began, Bednar, petitioner's accountant, adjusted its books and records for the taxable year 1961, eliminating many of the same type of defalcations which respondent had uncovered in the years 1959 and 1960. However, not all of the fradulent deductions were eliminated by Bednar from petitioner's 1961 income tax return. In this connection, we deem it significant that at a board of directors meeting on May 12, 1962, Bednar stated that he had told the revenue agent who was auditing petitioner's records that a "clean" return would be submitted for 1961 *213 and that although he had tried to eliminate any items which may be nondeductible "there was nothing he could do about fictitious invoices." The main thrust of petitioner's position is that although Hensley was guilty of fraud, this fraud should not be imputed to petitioner. We believe the record supports respondent's view that Hensley's continued control and association with petitioner after his defalcations were made known to petitioner by the revenue agents, are indicative of petitioner's condonation of his fraudulent actions during the taxable years involved. We note in this connection, that even after Hensley's fraudulent activities were revealed to petitioner's board of directors that some of the stockholders apparently condoned them in that he was reelected officer, director, and director of racing at a meeting of the board on April 12, 1962. More imprtant, we note that after Hensley sold his majority interest in petitioner, a long-term side employment agreement, dated June 4, 1969, was entered into between Eric Culver, who represented Newco Industries, the group which purchased some 90 percent of petitioner's stock and Hensley's family-owned corporation, Sierra Blanca Sales *214 Company. Under the terms of this agreement, Sierra Blanca (Hensley) was to receive $15,000 per year for a term of 15 years as a consultant for petitioner. It is clear that this agreement was designed to maintain Hensley's close association with petitioner after the taxable years involved herein. Viewing the record in its entirety, we are convinced that the fraudulent acts of Hensley should be imputed to petitioner. It would extend this opinion interminably and at the same time serve no useful purpose to analyze all of the arguments pro and con advanced by petitioner, on the one hand, and respondent on the other. We have examined each of them with care. Most of the arguments presented on petitioner's behalf are either unsound, inconclusive, or based on testimony unworthy of belief. In support of its position, petitioner relies principally on Asphalt Industries, Inc. v. Commissioner, 384 F. 2d 229 (C.A. 3, 1967), reversing 46 T.C. 622 (1966). [8] We have carefully considered this case and find it distinguishable on its facts from the instant proceeding. Unlike the case at bar, in Asphalt, there were only two 50 percent stockholders; the president, who was *215 one of these stockholders, illegally diverted corporate income to his own use; and the diverted income was not reported on the corporation's income tax returns. The Court of Appeals for the Third Circuit held that the wrongful conduct of the president-stockholder would not be attributed to the corporation since all of the shareholders were not parties to the fraud and the president was acting solely against the interests of the corporation. Here, however, Hensley was not acting solely adverse to the 814 interests of the petitioner. In addition to the payments made to or on his behalf, Hensley caused Ruidoso to fraudulently expense various assets and capital improvements which should have been depreciated and to substantially understate its income from bar and food sales during each of the years involved herein. Apart from the benefit realized by Ruidoso from Hensley's nonpersonal wrongdoing, as discussed hereinabove, it is clear that petitioner and its other shareholders benefited considerably during Hensley's tenure through the substantial growth of petitioner's plant and "handle," the receipt of consistent dividends, and the large increase in the value of its stock. We believe *216 that the unlimited control given to and exercised by Hensley as director of racing and through his actual and effective stock control of Ruidoso (62.8 percent to 75 percent) definitely distinguishes the instant case from Asphalt. In the light of the foregoing, we hold that petitioner is liable for the addition to tax for fraud under section 6653(b), supra, for each of the taxable years 1959 through 1961, inclusive. Because of our conclusion on this issue, petitioner's contention with respect to the statute of limitations need not be discussed. Decision will be entered under Rule 50. Footnotes
1. On May 13, 1970, respondent filed a "Motion to Reopen the Record to Receive Newly Discovered Evidence." By order dated June 10, 1970, this Court granted respondent's motion. By stipulation, a second deposition was taken of Hensley on September 15, 1970. Additional evidence consisting of this deposition, a supplemental stipulation of facts, documentary evidence, and testimony was presented during the hearing held on December 2, 1970.↩
2. The record in this case was closed and the case submitted on January 7, 1970. Subsequent thereto, and after the original briefs had been submitted, respondent uncovered additional evidence, viz., an employment agreement and related documents. At a hearing on respondent's motion to reopen the record to receive newly discovered evidence, this Court ruled, on June 10, 1970, that this evidence was newly discovered and was relevant to the issue, and that the record be reopened for the purpose of receiving the evidence.↩
3. The Court of Appeals for the Tenth Circuit stated, in part, as follows: The original investigation was begun in January 1961, and continued until April 1962, by Agent Spence. This agent's conduct, understated, was completely reprehensible and Spence's total unfitness was judicially determined some three months before the trial of the case at bar by his conviction for soliciting and acecepting a bribe in an unrelated tax case. After April 1962, Special Agent Reynolds was assigned to the case and although for some time thereafter Spence continued to work with Reynolds the primary responsibility of investigating and preparing the government's case was charged to Reynolds. Reynolds' integrity is in no way questioned by appellant nor by the record. Appellant asserts that Spence's participation so taints the prosecution as to deny the application of due process. We do not agree. * * * the government here wholly relied upon the testimony of the company's suppliers and company documents which clearly and convincingly showed that the appellant-controlled corporation bestowed gratuities on friends and relatives of appellant and unlawfully deducted the amounts as legitimate business expenses to the company and which were not reflected as income to appellant. This evidence was so self-sufficient that neither Spence nor Special Agent Reynolds testified at the trial.↩
4. In his deposition taken on November 26,1969, Hensley, on cross-examination, testified as follows: Q. Mr. Hensley, you testified on direct examination that you acquired control of the Ruidoso Racing Association in about 1953. A. Yes, sir. Q. During the years 1959, 1960, and 1961, you still retained control of the corporation. A. Yes, sir. Q. That is, you had a majority stock holding in the corporation? A. I had about that time about sixty-nine percent.↩
5. The parties stipulated that the testimony of all witnesses together with all stipulations and exhibits admitted in evidence in the case of United States of America v. Eugene V. Hensley, No. 22522 Cr., District Court, New Mexico (except the testimony and exhibits of the summary witnesses) may be admitted in evidence in the instant proceeding. Accordingly the parties stipulated portions of the transcript of the above-named case which was designated as Exhibit F (consisting of five volumes) and included some 800 pages covering the testimony of 39 witnesses. Additionally, the parties admitted into evidence in the instant proceeding some 300 exhibits (which included several thousand documents) which had been admitted into evidence in the criminal case.↩
6. In his deposition, on cross-examination, Hensley testified as follows: Q. Have you used the funds of the corporation to pay for personal expenses or items for the personal benefit of any of your family? A. Well, one part of one season I kept my daughter and my son on the payroll when my son was going to college at Arizona State and my daughter was, I don't know where she was, in Phoenix, I think. ↩
7. Gary testified as follows with respect to the payment of rent: Q. Now, did you ever have any discussion with your father about rent on that house? A. Yes, I did. Q. What did he tell you about that? A. He told me that I would be allowed to live in this house, and he would take care of the payments on the house; the rent. Q. That he would - A. Yes, he or the Race Track. To me they are one and the same.↩
8. This case was considered on remand in Asphalt Industries, Inc., T.C. Memo. 1968-155, affd. in Asphalt Industries, Inc. v. Commissioner, 411 F. 2d 13↩ (C.A. 3, 1969) on another issue.