JAMES WILLIAMSON and VERA WILLIAMSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williamson v. Commissioner
Docket No. 32345-88
United States Tax Court
T.C. Memo 1993-246; 1993 Tax Ct. Memo LEXIS 243; 65 T.C.M. (CCH) 2854; June 1, 1993, Filed *243 For petitioners: Harris H. Barnes III. For respondent: Helen C. T. Smith. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax Sec. Sec. Sec. Year
Deficiency 6653(b)(1) [1]
6653(b)(2) 6661 1980
$ 18,673.48
$  9,336.74
-0-
-0-    1981
26,253.91
13,126.95
-0-
-0-    1982
50,599.87
25,299.93
[2] $ 12,649.97
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues remaining for decision are: 1. Whether each petitioner is liable for additions to tax for fraud under section 6653(b) for the years 1980 and 1981, and under *244 section 6653(b)(1) and (2) for 1982; 2. Whether petitioners are liable for the addition to tax under section 6661 for the year 1982; and 3. Whether the statute of limitations bars the assessment of tax for each of the years 1980, 1981, and 1982. FINDINGS OF FACTS Some of the facts have been stipulated and, except as otherwise expressly noted herein, are so found. [1] The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners' legal residence at the time they filed their petition in this case *245 was Ethel, Mississippi. Petitioners were married in 1942 and have one son, James Terry Williamson (Terry), who is their only child. Petitioner James Williamson (James) has a third-grade education and petitioner Vera Williamson (Vera) has a sixth-grade education. They married when Vera was 14 years old. After they were married, petitioners worked in factories in St. Louis, Missouri. James worked for General Motors Corporation for 7 years while they lived in St. Louis. Williamson's Store
During the years at issue, petitioners operated a store, known as Williamson's Store, located near Ethel, Mississippi, on Highway 14 in Attala County, Mississippi. The store was located near the juncture of four county boundaries (Attala, Neshoba, Winston, and Choctow Counties), and only in Attala County could beer be legally sold. Williamson's Store, petitioners' home, and Terry's residence are all located within a few hundred yards of each other. Vera began operating Williamson's Store in 1971 with her sister-in-law, Alice Williamson (Alice), who was married to James' twin brother, Jack Williamson (Jack). Prior to 1971, Vera had been a housewife and had not operated a grocery store *246 or any other business. Sometime between 1971 and 1975, Alice discontinued her interest in the store, and Vera began to operate the store as a sole proprietorship. The Invoice-Markup System
In 1971, when Vera began operating Williamson's Store, someone told Vera that she was required to file monthly State sales tax returns. At that time, Vera and Alice retained Flora Riley (Riley) to prepare the monthly State sales tax returns for Williamson's Store. Also in 1971, petitioners first hired Riley to prepare their Federal and State income tax returns. Riley is a native of Attala County, Mississippi. She holds a B.S. degree with a major in accounting from Mississippi State University and has been a public accountant since 1969. Although Riley is not a certified public accountant, she is an enrolled agent before the Internal Revenue Service (IRS). Petitioners hired Riley to prepare returns for all of their monthly State sales taxes, State income taxes, and Federal income taxes. Riley prepared all of the Federal and State income tax returns and State sales tax returns filed by petitioners for the years 1971 through 1986, including the years at issue. Petitioners paid Riley *247 $ 10 per month to prepare the State sales tax returns and $ 700 each year to prepare the Federal and State income tax returns. In preparing those returns, Riley computed the gross sales receipts, costs of goods sold, deductible expenses and net profit or loss from Williamson's Store. When Vera and Alice first retained Riley, the store did not have a cash register. When informed that the store did not have a cash register, Riley told Vera that the easiest way to "keep up with" all of the sales and income would be to use the invoice-markup method. Riley also used the invoice-markup method to compute the gross receipts of other clients. Riley explained to Vera that she would compute the gross receipts from Williamson's Store by marking up the purchase invoices by 25 percent. [2] Riley told Vera and Alice to provide her with all of the invoices of purchases, whether paid by cash or by check. Aside from instructing Vera and Alice to provide all of the invoices whether paid by cash or by check, Riley did not give any further instructions regarding documentation of the cost of purchases or gross receipts. *248 Each month Vera would take the invoices from Williamson's Store to Riley's office. Riley would then prepare the State sales tax return using the invoice-markup method to determine gross receipts. After Riley had prepared the monthly sales tax return, Riley's secretary would notify petitioners that the return was ready. Vera would pick up the return at Riley's office, write a check to pay the tax due, and then send the return along with the payment to the Mississippi State Tax Commission. Vera understood the importance of timely filing the State sales tax returns to avoid a penalty. As a rule Vera conducted all transactions with Riley. James went to Riley's office on only one occasion and never spoke to Riley. In preparing petitioners' annual Federal and State income tax returns, Riley used the information provided by Vera for the monthly State sales tax returns for gross receipts and costs of goods sold. To determine the deductible expenses of operating Williamson's Store, Riley used canceled checks and receipts furnished to her by petitioners. Riley had explained to Vera the type of expenses that were deductible in determining net profit earned by the store. The net profit *249 or loss from Williamson's Store was computed on a Schedule C on which Riley indicated that she had used the invoice-markup method and the cash method of accounting. The invoice-markup method is not an accounting method but a method of reconstruction of gross receipts in the absence of books or records. Vera did not keep any accounting books or records for Williamson's Store. Vera did not know the meaning of cash receipts journal, cash disbursements journal, or accounts payable journal. Riley knew that Williamson's Store did not have a cash register or any accounting books or records. She never suggested a different way of keeping account of the store's receipts other than using the invoice-markup method. There was a bank account for Williamson's Store, but not all of the sales receipts were deposited into that account and not all of the store's expenses were paid out of that account. Riley knew that petitioners maintained a separate bank account for the store, but she never asked to see the statements from that account. Riley thought that, if petitioners supplied her with all of the invoices and if she applied the 25-percent markup to all of the invoices, she was assured of *250 accounting for all of the income. Conversely, Riley thought that, if bank statements were used, any income not deposited in the bank would not be included in the computation. Riley, however, knew that income from any omitted invoices also would not be included. Riley had no reason to think that she was not receiving all of the invoices from Williamson's Store. Riley thought that the IRS and the Mississippi State Tax Commission accepted invoice markup as a valid method for determining gross receipts. Sometime prior to 1980, petitioners acquired a cash register for the store, but did not tell Riley of that fact. Vera totaled the tapes from the cash register on a weekly basis. [3] Petitioners, however, did not provide Riley with the cash register tapes or the weekly totals of those tapes. *251 Riley never offered to provide any bookkeeping or accounting services other than the preparation of the Federal and State income tax returns and the State sales tax returns. Petitioners never asked Riley to provide any such additional services. Riley did not prepare or maintain any books or records of account for the store, nor did she prepare a financial statement. Riley did not reconcile petitioners' bank statements. Riley was qualified to prepare and maintain books or records of account and to prepare financial statements. However, she was not qualified to be, and did not hold herself out to be, a tax adviser or a financial adviser. Operations of Williamson's Store
At Williamson's Store, petitioners sold beer as well as gasoline and food items. At one time they operated a pool hall attached to the store. Williamson's Store was open 7 days a week, from 5:30 in the morning until 10:00 at night. Although Vera worked more frequently at the store than James, both petitioners worked at the store prior to and during the years at issue. Vera and petitioners' son, Terry, worked long hours at the store. Other individuals, including Terry's wife and nonfamily members, worked *252 in the store during that period. During the earlier years, petitioners accepted major credit cards, but by 1980 had stopped accepting them because it became too much of a problem. Petitioners did maintain an informal charge account system for certain customers and maintained a record of the charges in a little book. Petitioners did not charge the customers interest for this credit. Because the store operated primarily on a cash basis, petitioners cashed payroll checks for customers. Petitioners paid for some merchandise for the store by cash and for other merchandise by writing checks. Petitioners would pay for the merchandise by cash taken from the cash register. Petitioners and all their employees had access to the cash register and purchased merchandise for the store. Petitioners maintained the invoices for merchandise purchases in a file cabinet located in the store. When merchandise was purchased by cash, Vera normally kept an invoice or made a record of the purchase and included it with the other invoices. Petitioners maintained a bank account at the Attala Bank of Kosciusko, Mississippi, in the name of Williamson's Store for the purpose of purchasing merchandise and *253 paying expenses of the store. Kosciusko, Mississippi, is approximately 16 miles from the store. Vera had to drive the 32-mile round-trip to Kosciusko because the bank did not have a branch office in Ethel, Mississippi. Petitioners, usually Vera, made deposits into the Williamson's Store bank account once every week or once every 2 weeks. Vera would take all of the cash and checks from the store to the bank. She would then deposit into the Williamson's Store account enough money to cover checks she had written for store purchases and expenses. Vera shared with Terry any excess above the deposits into the store account. The excess was deposited into bank accounts that petitioners and Terry maintained separately from the Williamson's Store account. [4]
*254 Both Vera and James had authority to sign checks and withdraw money from the Williamson's Store account. Both had access to, and went into, the cash register at the store. In addition to the Williamson's Store account, petitioners maintained four other checking accounts at the Attala Bank of Kosciusko. Those accounts were in the names of James Williamson, Vera Williamson, Vera Steed, and James Terry Williamson. Neither Vera nor James could withdraw funds or sign checks on the James Terry Williamson account. Vera maintained a bank account in her maiden name, Vera Steed, from the time she was 14 or 15 years old and throughout her marriage. Beginning in 1980, in order to qualify James for Social Security benefits, Williamson's Store began to pay him a commission. Petitioners reported James' commission income as an expense of the store on the 1980 return and paid self-employment tax on this commission income. Carnaggio Distributing Company
The primary product sold in Williamson's Store was beer. The store was strategically located, being the only place for miles around that could legally sell beer. Prior to 1980, petitioners had purchased some of the beer from Carnaggio's *255 Distributing Company, Inc. (Carnaggio Distributing), located in Greenwood, Mississippi. Phillip Carnaggio (Carnaggio), president of Carnaggio Distributing, has operated a wholesale beer outlet in Greenwood, Mississippi, since 1955. Beer wholesalers operate through a franchise system. Prior to 1980, Carnaggio Distributing had the franchise right to sell certain brands of beer in Attala, Holmes, and Yazoo Counties, Mississippi. Sometime between 1979 and 1980, Carnaggio Distributing sold that franchise right to a subwholesaler located in Yazoo City, Mississippi. Because Williamson's Store was located in Attala County, Carnaggio Distributing could no longer sell those brands to petitioners. Williamson's Store, however, was one of Carnaggio Distributing's largest customers. To keep the store as a customer, Carnaggio Distributing made a special arrangement to sell truckload quantities of beer to Williamson's Store at special discounted prices. A truckload quantity is approximately 600 cases of beer. Jack Murphy (Murphy), an employee and vice president of Carnaggio Distributing, and either James or his son, Terry, worked out the arrangement. At the time Carnaggio Distributing entered *256 into the agreement with petitioners, Carnaggio knew that such sales violated his franchise agreements. Carnaggio also knew that, if discovered by the breweries, he could lose his franchise. In the normal course of its business, Carnaggio Distributing maintained a system for invoicing sales. It was Carnaggio Distributing's normal practice to give customers an invoice for every sale of beer made. Under Mississippi law Carnaggio Distributing could sell beer only to retailers licensed by the State of Mississippi. Each licensed retailer had a permit number that Carnaggio Distributing recorded on its sales invoices. Carnaggio Distributing did not use petitioners' permit number on sales made to them during 1980, 1981, and 1982, because the company was afraid that the breweries would discover its franchise agreement violations. Instead, Carnaggio Distributing arranged to invoice the beer petitioners purchased to Jimmy Mims (Mims), another retailer. Mims operated his business, Mims Produce Company, from two locations in Carroll County, Mississippi. Mims had a valid permit to purchase beer in Carroll County, which was within Carnaggio Distributing's geographic franchise area. Murphy *257 asked Mims to allow Carnaggio Distributing to use Mims' name and permit number to make sales of beer to petitioners. [5] Carnaggio Distributing agreed to pay Mims 25 cents per case for the use of his name and permit number. Each month either Murphy or another Carnaggio Distributing employee went to Mims' store and paid him the 25 cents per case in cash, usually about $ 300 - $ 400 a month. Mims never took possession of the beer, and he never received any of the invoices bearing his name and number representing sales of beer to Williamson's Store (the Mims invoices). *258 Mims never discussed the arrangement with Vera or James. Mims did discuss the arrangement with Terry. At some point, apparently about the time of a Government raid in 1984, Terry requested through Murphy that Mims give Terry a ticket stating that all State sales tax had been paid on the beer purchased in Mims' name. Mims made out a false invoice and delivered it to Terry. When Carnaggio Distributing first began to sell petitioners beer under the arrangement, Carnaggio did not want to give petitioners the Mims invoices. Instead, he gave petitioners an adding machine tape that indicated the total quantity of beer sold, the price per case or lot, and the total price. After the first few sales, however, Carnaggio was willing to give petitioners the Mims invoices. James and Terry were offered the Mims invoices, but they refused to accept them. On one occasion, James did accept a Mims invoice from Carnaggio Distributing "to get him home in case he was stopped on the road". Carnaggio Distributing kept in its warehouse all of the remaining Mims invoices. Carnaggio Distributing paid the State wholesaler's sales tax on the beer sold to petitioners in Mims' name. [6]
*259 Carnaggio Distributing did not deliver the beer to Williamson's Store. Instead, Terry or James drove to Carnaggio Distributing in Greenwood, Mississippi, once or twice a month to purchase and pick up beer. Terry most often made the purchase trips. When Terry and James purchased the beer, they gave to a Carnaggio Distributing employee a list of the brands and quantities of beer they wanted to purchase. That list was used both to load the truck and to prepare the invoice to Mims. When Terry and James returned to the store with the beer purchased from Carnaggio Distributing, they stored the beer in the store and in various storage facilities near the store and family residences. During the years 1980 through 1982, petitioners purchased one or two truckloads (between 600 and 1,200 cases) of beer per month from Carnaggio Distributing. They paid for the beer either by cash, taken from the cash register at Williamson's Store, or by check. Carnaggio Distributing did not give James or Terry a receipt or the Mims invoice. If he paid for the beer by check, James or Terry would record the amount of the check on a piece of paper to ensure that Vera would deposit sufficient funds into *260 the store's bank account to cover the check. Vera and James could always determine the total dollar amount of their purchases from their own shopping list of brands and quantities and from their knowledge of the special discounted prices they received from Carnaggio Distributing. On occasion when Carnaggio Distributing made an error in the price charged or in the computation of the total bill, Vera or James brought it to the company's attention for correction. After 1982, Carnaggio Distributing's franchisors learned of the arrangement with petitioners, and demanded that the company stop making such sales. Shortly thereafter, Vera obtained a permit to sell beer in Carroll County, and petitioners began purchasing beer directly from Carnaggio Distributing without going through Mims. Petitioners continued to pick up the beer from the Carnaggio Distributing plant in Greenwood, Mississippi. Petitioners accepted the invoices prepared for those subsequent years' sales. Preparation of Petitioners' Tax Returns for 1980, 1981, and 1982
Petitioners filed joint Federal income tax returns for the years 1980, 1981, and 1982. Vera may have signed James' name on the 1980 return, but *261 if so she did so with his consent. James signed his own name on the 1981 and 1982 returns. Riley prepared those returns. Petitioners never told Riley about the beer they had purchased during the years 1980, 1981, and 1982 from Carnaggio Distributing in the name of Mims Produce Company. Vera knew that she was supposed to provide Riley with an invoice, receipt, or some other documentation for all purchases made for the store. Petitioners, however, did not give Riley any invoices or any other documentation of the beer purchases they made during the years 1980, 1981, or 1982 from Carnaggio Distributing in the name of Mims Produce Company. When Riley prepared petitioners' income tax returns for those years, she had no knowledge of any of the beer purchased from Carnaggio Distributing in the name of Mims Produce Company. Riley first learned of those purchases when she testified at petitioners' criminal trial in 1988. James and Vera knew that the beer being bought from Carnaggio Distributing was being invoiced to Mims and that they were not receiving any invoices for the purchase of that beer. James and Vera knew that Riley prepared petitioners' tax returns by marking up invoices *262 by 25 percent. James and Vera knew that they were getting the beer from Carnaggio Distributing, selling that beer, and receiving money from the sales of that beer. James and Vera knew that they did not receive any invoices for that beer and that Riley was not given any invoices or any other documentation for that beer. During 1982, Riley noticed that petitioners were not submitting as many invoices as they had in prior years. Riley asked Vera about this, and Vera told her that the store's business was down because a new store had opened nearby. Actually petitioners' profits in 1982 increased over the prior 2 years. Petitioners claimed a loss from the operations of Williamson's Store on their 1982 return. Criminal Prosecution
On April 14, 1987, a Federal grand jury in the United States District Court for the Northern District of Mississippi (the District Court) returned a true bill and indictment against petitioners and their son, Terry. The grand jury charged that petitioners willfully and knowingly made and subscribed income tax returns for the years 1980, 1981, and 1982 under penalties of perjury, when they did not believe the returns to be true and correct as to *263 every material matter, all in violation of section 7206(1). The falsity was in the gross receipts amounts which petitioners well knew and believed to be higher than the figures reported on their returns. On August 10, 1988, a jury impaneled by the District Court returned verdicts of guilty as to both petitioners on all three counts of violating section 7206(1). [7] On November 4, 1988, the District Court entered orders of judgment against James and Vera. The court sentenced James to serve 4 years in prison, imposed a fine of $ 5,000, and placed him on probation for 5 years after he served his 4-year imprisonment term. The court sentenced Vera to serve a prison term of 6 months, to pay a fine of $ 5,000, and placed her on probation for a period of 5 years after she served her imprisonment term. The U.S. Court of Appeals for the Fifth Circuit affirmed petitioners' convictions on all three counts. At their criminal trial, petitioners and Terry were represented by two attorneys, *264 J.P. Coleman and James McIntyre. They paid the attorneys a total of $ 56,000 ($ 30,000 to Coleman and $ 26,000 to McIntyre) to represent them in the criminal proceeding. [8]
Deficiencies and Additions to Tax
Shortly before petitioners' criminal case was scheduled for trial, petitioners transferred property to James' twin brother, Jack. [9] At the same time petitioners transferred property to Jack, petitioners withdrew all funds from their bank accounts and cashed all of their certificates of deposit. [10] The property transferred to Jack included petitioners' home. Both petitioners signed the transfer deeds. Upon Vera's release from prison, she returned to the house earlier conveyed to Jack. She has continued to live in that house since her release from prison. James has also lived in *265 that house since his release from prison. On August 22, 1988, the District Director of Internal Revenue for the District of Mississippi entered a jeopardy assessment against petitioners. On September 22, 1988, petitioners administratively appealed the jeopardy assessment by filing a written protest with the appeals office in Jackson, Mississippi. On October 7, 1988, the Appeals Office advised petitioners that their administrative appeal was denied. Petitioners did not judicially appeal the jeopardy assessment. *266 On October 20, 1988, respondent issued to petitioners a statutory notice of deficiency for the years 1980, 1981, and 1982. Reconstruction of Income
Respondent used the bank deposits and cash expenditures method to reconstruct petitioners' income for the years 1980, 1981, and 1982. Interest income and income from the Williamson's Store were the only sources of income indicated on petitioners' Federal income tax returns for all years at issue. 1. Interest Income
Petitioners reported that they earned interest income in the amount of $ 3,914.24 in 1980, $ 12,752.53 in 1981, and $ 17,330.85 in 1982. Petitioners' six certificates of deposit at the Peoples Bank of Mississippi earned the following interest during 1981: No. 653
$  3,313.10
No. 808
3,746.90
No. 1,000
3,047.87
No. 721
1,909.63
No. 878
1,918.48
No. 886
735.03
Total interest earned
$ 14,671.01
Thus, petitioners understated the interest income they earned during 1981 by the amount of $ 1,918.48, presumably the interest on certificate of deposit No. 878. Respondent does not allege any error in the amounts of interest reported on the 1980 and 1982 returns. 2. *267 Schedule C Gross Receipts
During the years at issue, petitioners maintained five checking accounts at the Attala Bank of Kosciusko, Mississippi. During those years, petitioners deposited the following amounts into their accounts: Account Name
Number
1980
1981
1982
Williamson's Store
(680-413-2)
$ 326,803.64
$ 312,412.61
$ 269,015.87
James Williamson
(385-194-6)
935.00
1,200.00
50,047.94
Vera Williamson
(385-930-6)
37,571.31
48,888.87
52,314.82
Vera Steed
(382-564-3)
5,750.00
10,120.00
12,017.00
James Terry Williamson
(385-102-9)
5,876.26
24,683.82
27,280.82
Petitioners purchased certificates of deposit from the Peoples Bank of Mississippi in the amounts of $ 85,000 in 1980, $ 30,000 in 1981, and $ 20,000 in 1982. During the year 1980, petitioners paid $ 1,000 in cash to purchase a cashier's check made payable to Kenneth M. Mundy and paid Village Cycle Center $ 1,430 in cash to purchase an all-terrain vehicle. During the year 1981, petitioners paid $ 735.03 in cash on loans and paid Harreld Chevrolet Company $ 2,500 in cash to purchase a new 1981 Oldsmobile sedan. During the year 1982, petitioners paid Crockett Motor Company $ 1,960 in cash *268 to purchase a 1976 Pontiac sedan and paid Grenada Sales Company $ 5,405.13 in cash to purchase a 1983 Lincoln Mark VI. Petitioners' deposits into their checking accounts, certificates of deposits, and cash expenditures specified above totaled $ 464,395.21 in 1980, $ 430,540.33 in 1981, and $ 466,903.33 in 1982. The portion of those amounts attributable to nontaxable sources are as follows: 1980
1981
1982
Returned checks not deposited
$  1,578.69
$  1,098.11
$    521.67
Interbank transfers
50,000.00
-0-  -0-  Interest income redeposited
3,914.24
7,575.01
1,658.94
Interbank checks
16,085.76
22,334.62
23,341.06
Williamson Store payments
3,657.25
1,313.60
350.35
Loan proceeds
-0-  20,000.00
20,000.00
Proceeds from sale of car
-0-  -0-  8,800.00
Reductions for nontaxable
sources
$ 75,235.94
$ 52,321.34
$ 54,672.02
The parties have stipulated that petitioners' gross receipts for each of the years at issue were as follows: 1980
1981
1982
Total bank deposits and
cash expenditures
$ 464,395.21
$ 430,540.33
$ 466,903.33
Less reduction for
nontaxable sources
75,235.94
52,321.34
54,672.02
Gross receipts
$ 389,159.27
$ 378,218.99
$ 412,231.31
*269 Subsequent to that stipulation, the parties later agreed to reduce the gross receipts figure for 1982 from $ 412,231.31 to $ 391,772. The parties have computed the agreed deficiency for 1982 on total gross receipts of $ 391,772 for that year. On Schedules C attached to their Federal income tax returns, petitioners reported gross receipts from Williamson's Store in the amounts of $ 280,667.79 in 1980, $ 127,901.57 in 1981, and $ 47,157.94 in 1982. Petitioners understated their gross receipts from Williamson's Store on their returns during the years at issue as follows: 1980
1981
1982
Schedule C gross receipts
$ 389,159.27
$ 378,218.99
$ 391,772.00
Less gross receipts reported
280,667.19
127,901.57
47,157.94
Understatement of Schedule C
gross receipts
$ 108,491.48
$ 250,317.42
$ 344,614.06
3. Schedule C Costs of Goods Sold
On their Federal income tax returns, petitioners reported costs of goods sold in the amounts of $ 235,452.50 in 1980, $ 97,218.28 in 1981, and $ 34,205.12 in 1982. Petitioners omitted from their returns the costs of beer purchased from Carnaggio Distributing in the name of Mims Produce Company, in the amounts of $ 7,496 in 1980, *270 $ 66,891 in 1981, and $ 90,050 in 1982. The parties have stipulated that petitioners also omitted from their returns other purchases they made in the amounts of $ 65,415.12 in 1980, $ 106,448.37 in 1981, and $ 123,814.61 in 1982. The parties have since further agreed to increase the costs of goods sold in 1982 by $ 21,517. Petitioners understated their costs of goods sold as follows: 1980
1981
1982
Carnaggio beer purchases
$  7,496.00
$  66,891.00
$  90,050.00
Other stipulated
omitted purchases
65,415.12
106,448.37
123,814.61
Agreed 1982 increase
-0-  -0-  21,517.00
Omitted costs of goods sold
$ 72,911.12
$ 173,339.37
[11] $ 235,381.61
Petitioners' costs of goods sold totaled the following amounts for the years at issue: 1980
1981
1982
Reported costs
of goods sold
$ 235,452.50
$  97,218.28
$  34,205.12
plus omitted costs of
goods sold
72,911.12
$ 173,339.37
$ 235,381.61
Total costs of goods sold
$ 308,363.62
$ 270,557.65
$ 269,586.73
*271 4. Schedule C Gross Profit
On their Federal income tax returns, petitioners reported gross profits from Williamson's Store in the amount of $ 45,215.29 in 1980, $ 30,683.29 in 1981, and $ 12,952.82 in 1982. Petitioners made the following gross profits from Williamson's Store during the years at issue: 1980
1981
1982
Gross receipts
$ 389,159.27
$ 378,218.99
$ 391,772.00
Less costs of goods sold
308,363.62
270,557.65
269,586.73
Gross profits
$ 80,795.65
$ 107,661.34
$ 122,185.27
Petitioners underreported the gross profit from Williamson's Store for the years at issue as follows: 1980
1981
1982
Gross profit
$ 80,795.65
$ 107,661.34
$ 122,185.27
Less gross profit reported
45,215.29
30,683.29
12,952.82
Understatement of
Gross profit
$ 35,580.36
$  76,978.05
$ 109,232.45
5. Schedule C Expenses
During the years 1980 through 1982, petitioners actually paid, but reported and claimed, Schedule C expenses as follows: 1980
1981
Paid
Reported
Paid
Reported
Advertising
$      0.00
$    100.00
$      0.00
$      0.00
Commissions
5,876.26
14,768.71
24,683.82
4,399.68
Depreciation
6,278.53
6,949.28
8,447.18
12,562.89
Insurance
692.00
1,313.00
692.00
1,384.00
Legal/accounting
120.00
320.00
120.00
445.00
Repairs
2,179.11
710.39
3,156.88
0.00
Supplies
218.78
542.22
282.89
328.90
Taxes/licenses
3,321.70
3,495.56
301.56
141.81
Telephone
709.02
624.67
828.51
*  Utilities
4,879.00
5,122.75
6,574.43
7,021.33
Bank charges
10.00
0.00
6.00
0.00
Sales tax
0.00
0.00
1,474.41
0.00
Auto expense
998.00
0.00
998.00
0.00
Total
$ 25,282.40
$ 33,946.58
$ 47,565.68
$ 26,283.61
*272 1982
Paid
Reported
Advertising
$      0.00
$      0.00
Commissions
27,280.82
3,600.00
Depreciation
6,841.94
15,129.24
Insurance
1,448.00
1,448.00
Legal/accounting
120.00
120.00
Repairs
613.21
0.00
Supplies
200.60
429.26
Taxes/licenses
1,009.78
916.75
Telephone
562.54
*  Utilities
5,960.44
6,114.04
Bank charges
2.00
0.00
Sales tax
540.06
0.00
Auto expense
998.00
0.00
Total
$ 45,577.39
$ 27,757.29
Petitioners overstated their Schedule C expenses by $ 8,664.18 in 1980 and understated their Schedule C expenses in the amounts of $ 21,282.07 in 1981, and $ 17,820.10 in 1982. 6. Schedule C Net Profit
On their Federal income tax returns, petitioners reported net profits from Williamson's Store in the amount of $ 11,268.71 in 1980 and $ 4,399.68 in 1981. They reported a net loss in the amount of $ 14,804.47 on their 1982 return. Petitioners made the following net profits from Williamson's *273 Store during the years at issue: 1980
1981
1982
Gross profit
$ 80,795.65
$ 107,661.34
$ 122,185.27
Less expenses paid
25,282.40
47,565.68
45,577.39
Net profit
$ 55,513.25
$  60,095.66
$  76,607.88
Petitioners underreported the net profit from Williamson's Store for the years at issue as follows: 1980
1981
1982
Net profit
$ 55,513.25
$ 60,095.66
$ 76,607.88 Less net profit (loss)
reported
11,268.71
4,399.68
(14,804.47)
Understatement of
Net profit
$ 44,244.54
$ 55,695.98
$ 91,412.35 Income Tax Deficiencies
The parties have stipulated that the income tax deficiencies due from petitioners are $ 12,479 for 1980, $ 23,328 for 1981, and $ 34,787 for 1982. These stipulated deficiency amounts reflect all costs of goods sold, including the beer purchased by petitioners from Carnaggio Distributing through Mims Produce Company, and the other omitted purchases. The stipulated deficiency for 1982 reflects the additional agreed adjustment of $ 21,517 to the costs of goods sold in excess of the stipulated amount and the agreed decrease in the gross receipts figure for that year. These stipulated deficiency amounts also reflect income *274 averaging, to which respondent concedes petitioners are entitled. The parties also agree that, because the limitations periods for 1980 and 1981 have otherwise expired, the deficiencies for those years are contingent upon this Court's affirmance of the fraud additions for those years. The parties have also stipulated to the amounts of the additions to tax if fraud is proved. The stipulated amounts of the deficiencies and the additions are as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)
Sec. 6653(b)(2)
Sec. 6661
(1)
1980
$ 12,479
$ 6,239
-0- -0-
-0-  1981
23,328
11,664
-0- -0-
-0-  1982
34,787
$ 17,393
50% of the
$ 8,697
interest
due on
$ 34,787
Testimony of Ernest Edward Aune
Ernest Edward Aune (Aune) testified on behalf of petitioners. Aune majored in accounting and received a bachelors degree in business administration from the University of Mississippi in 1978. He has been a certified public accountant (C.P.A.) since 1979. Aune has an office in Oxford, Mississippi, where he practices as a C.P.A. with a partner. Aune's services primarily involve bookkeeping, *275 income tax return preparation, and tax planning. In 1988, at the request of Riley and petitioners' attorney, Coleman, Aune reviewed copies of petitioners' and Terry's bank statements, canceled checks, bank notes, certificates of deposit, and tax returns. He also reviewed the understatement of gross receipts computations made by the IRS agent and concluded that the IRS computations of gross receipts were substantially correct. In August of 1988, petitioners again consulted with Aune regarding the jeopardy assessment. Aune reviewed respondent's computation of tax. Aune noted that, although respondent had added the understatements of gross receipts to petitioners' income, she had failed to deduct the costs of sales that were also omitted from the returns for the taxable years at issue. Aune recalculated petitioners' income tax deficiencies and participated in the discussions with respondent's representatives that ultimately led to the stipulated amounts of the deficiencies and additions in this case. Using the stipulated amounts, Aune computed the total amount of understated gross profit (the difference between the gross sales (gross receipts) and the cost of sales (costs of goods *276 sold) that was understated) for each of the years at issue. Aune calculated that understated gross profit was $ 35,578.33 in 1980, $ 76,977.72 in 1982, and $ 109,232.45 in 1982, which amounts are substantially the same as the figures in our findings of fact above. Aune testified that these amounts represent the difference between the amounts reported on petitioners' returns and the amounts as adjusted by the IRS audit. Aune then examined the invoice-markup method used by Riley. Based on the figures reported on the tax returns, Aune concluded that Riley did not mark up the cost of sales by 25 percent in any of the years, but rather marked up the cost of sales by 19.2 percent in 1980, by 31.6 percent in 1981, and by 37.9 percent in 1982. [12] Aune then calculated the percentage that would have been required each year in order to compute the correct stipulated sales (gross receipts) from the correct stipulated adjusted costs of goods sold. [13] *278 He determined that the required percentages were 26.2 percent for 1980, 39.8 percent for 1981, and 45.3 percent for 1982. Aune then concluded that Riley's use of the lower percentages caused the resulting gross profit to be underreported. *277 Aune calculated that a total of $ 63,764.49 of the understated gross profit ($ 21,587.80 in 1980, $ 22,164.79 in 1981, and $ 20,011.90 in 1982) was attributable to Riley's use of the lower percentage. Aune examined the Mims invoices and calculated that $ 57,765.20 of the understated gross profit ($ 1,439.26 for 1980, $ 22,197.08 for 1981, and $ 34,128.86 for 1982) was attributable to the missing Mims invoices. [14] Aune concluded that the remaining $ 100,000 of the understatement was attributable to other sources; either invoices were not given to Riley, Riley did not calculate the invoices correctly, or some other reason. Riley's method contemplated reporting gross receipts in an amount equal to a 25-percent markup, i.e., 125 percent of total costs of goods sold. However, no matter what percentage Riley used, there would always be an understatement of gross receipts for any omitted invoices. If there are no invoices to which to apply the markup percentage, the gross receipts will always be understated by 100 percent of the omitted invoices plus the markup percentage, whatever the percentage may be. Aune makes his computations using the flawed invoice-markup method, which as he himself points out is used only to determine gross receipts in situations where there are no other records. In this case other records were used to reconstruct petitioners' income. Aune acknowledges *279 that respondent reconstructed petitioners' gross receipts by the bank deposits and cash expenditures method and that he (Aune) computed petitioners' costs of goods sold using their canceled checks and other documentation. We find Aune's reasoning to be circular and unpersuasive. See supra notes 13, 14. OPINION I Deficiencies
The parties have now stipulated and agreed to the income tax deficiencies due from petitioners for the years 1980, 1981, and 1982. The parties also agree that, because the limitations periods for the years 1980 and 1981 have otherwise expired, the deficiencies for those years can be assessed only if the Court finds fraud, in which event the tax (deficiencies and additions) can be assessed "at any time". Sec. 6501(c)(1). II Additions for Fraud
Respondent determined in the notice of deficiency that petitioners are liable for the additions to tax for fraud under section 6653(b) with respect to each of the years 1980 and 1981, and under section 6653(b) (1) and (2) for 1982. Respondent bears the burden of proof and must establish each element of fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), *280 affg. T.C. Memo. 1984-25; Wright v. Commissioner, 84 T.C. 636, 639 (1985). Respondent must prove by clear and convincing evidence the two elements of fraud: (1) the existence of an underpayment of tax each year, and (2) that some part of the underpayment is due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Mosteller v. Commissioner, T.C. Memo. 1986-505, affd. without published opinion 841 F.2d 1123 (4th Cir. 1988). Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner, 225 F.2d 216, 220 (6th Cir. 1955), affg. in part, revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954. Petitioners concede that there is an underpayment of tax for each of the years in issue. Therefore, respondent has met her burden of proof as to the first element. In order to establish fraud for purposes of the additions under section 6653(b) for 1980 and 1981, and under section 6653(b)(1) for 1982, respondent need not prove the precise amount of the underpayment resulting *281 from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. For purposes of the addition under section 6653(b)(2) for 1982, however, respondent must prove by clear and convincing evidence the portion of the underpayment attributable to fraud. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Franklin v. Commissioner, T.C. Memo. 1993-184. See also Estate of Stimson v. Commissioner, T.C. Memo. 1992-242; Bingo v. Commissioner, T.C. Memo. 1991-248, affd. 987 F.2d 774 (11th Cir. 1993). Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax believed to be owing. Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), *282 affg. T.C. Memo. 1985-63; Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud is not imputed from one spouse to another; in the case of a joint return, respondent must prove that some part of the underpayment is due to the fraud of each spouse. Sec. 6653(b) (for 1980 and 1981) and sec. 6653(b)(4) (for 1982); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Stone v. Commissioner, 56 T.C. 213, 227-228 (1971). Respondent must show that each petitioner intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of the tax. Stoltzfus v. United States, supra at 1004; Webb v. Commissioner, supra at 377. *283 Fraud is never to be presumed. Toussaint v. Commissioner, 743 F.2d at 312; Webb v. Commissioner, 394 F.2d at 377. The existence of fraud is a question of fact to be determined on the basis of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud, however, can seldom be proved by direct proof of the taxpayer's intention. Fraud can be established by circumstantial evidence and by reasonable inferences drawn from the taxpayer's entire course of conduct. Spies v. United States, 317 U.S. 492, 499 (1943); Toussaint v. Commissioner, 743 F.2d at 312; Gajewski v. Commissioner, supra at 200. Courts frequently list various factors or "badges of fraud" from which fraudulent intent may be inferred. Although such lists are nonexclusive, some of the factors this Court has considered as indicative of fraud are (1) understatement of income, (2) inadequate records, (3) implausible or inconsistent *284 explanations of behavior, (4) concealment of assets, (5) failure to cooperate with the tax authorities, (6) engaging in illegal activities, and (7) dealing in cash. Meier v. Commissioner, 91 T.C. 273, 297-298 (1988) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601). The taxpayer's evasiveness on the stand, inconsistencies in his or her testimony, and the lack of credibility of such testimony are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner, 743 F.2d at 312. 1. Additions under Section 6653(b) for 1980 and 1981, and under Section 6653(b)(1) for 1982.
"Although fraud cannot be inferred from the mere understatement of income, consistent and substantial underreporting is evidence of fraud." Webb v. Commissioner, 394 F.2d at 378-379. In this case, there was a pattern of consistent understatement of substantial amounts of petitioners' income for the 3 years at issue. This is strong evidence of fraud. Korecky v. Commissioner, 781 F.2d at 1568; *285 Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Petitioners also maintained inadequate records during the years at issue. Although Riley's use of the inventory-markup method may have been inappropriate, nevertheless petitioners concealed a substantial portion of their purchases from Riley during each of the 3 years at issue. When Riley questioned Vera about the reduction in the number of invoices, Vera told Riley that business was down and that the reduction was due to new competition. In fact, profits were substantially higher than in the preceding years. Thus, Vera deliberately misled Riley and cannot rely upon any inadequacies in the method the tax return preparer used. The underreporting, coupled with the showing that petitioners kept incomplete and inaccurate records and did not supply their accountant with all of the data necessary for maintaining complete and accurate records, is enough to warrant this Court's finding of fraud. Merritt v. Commissioner, 301 F.2d at 487. Petitioners were found guilty of filing a false return under section 7206(1) *286 for each of the years at issue. While intent to evade tax is not an element of the crime under section 7206(1), petitioners are collaterally estopped from denying that they willfully and knowingly filed false returns for those years and that the falsities were that their returns reported certain gross receipts, whereas the true gross receipts were substantially in excess of the amounts reported, as petitioners then and there well knew and believed. Meier v. Commissioner, 91 T.C. at 282-286; Wright v. Commissioner, 84 T.C. 636, 643-644 (1985); Castillo v. Commissioner, 84 T.C. 405, 409-410 (1985). Petitioners argue that, although their actions may have been negligent, they were not fraudulent. They reason that, when Vera and Alice started the store in 1971, Vera was told that she would have to pay State sales tax. Petitioners, therefore, hired Riley as their accountant. Riley was to compute their gross receipts, net income, monthly sales tax liability, annual Federal and State income tax liability, and to prepare all tax returns. Riley decided to use the invoice-markup method because *287 she thought it was the easiest method of calculating the gross receipts. Petitioners argue that, being "country folks" with very limited educations and completely unskilled in financial matters, they reasonably relied upon Riley's performance of such services. With regard to the Carnaggio Distributing beer sales, petitioners argue that, because Carnaggio never gave them invoices for the beer purchases, they had no invoices to give to Riley. [15] Petitioners assert that Murphy told them not to worry about the tax because the beer was being billed through Mims and that someone else was paying the tax. Apparently, petitioners conclude, therefore, it was unnecessary for them to otherwise inform Riley of the Carnaggio Distributing beer sales. Petitioners testified that they did not report any income from the sale of the Carnaggio Distributing beer on their tax returns because Jack Murphy told Terry that they would not owe any taxes. The Court did not believe their testimony. At best petitioners may have been told that the State wholesaler's sales tax on such beer had been paid by someone else. See supra note 6. Petitioners knew that no one was paying the tax on their unreported *288 income from their retail sales of that beer. Petitioners contend that Riley's invoice-markup methodology for reporting income was flawed from the start. They assert that the understatement of income resulting from the omitted beer invoices was not as significant as the understatement resulting from either Riley's use of the wrong percentage to mark up the invoices or her use of an improper accounting method. Petitioners contend *289 that, if Riley had used (or instructed petitioners to use) a proper method of accounting, there would have been no underreporting of income. Petitioners conclude that such circumstances do not indicate a willful effort to underreport income and evade tax. We do not agree. The understatement of income reported on the returns cannot be blamed on petitioners' reliance on Riley. If,as petitioners assert, they relied upon Riley to determine their income and tax liability, they should have consulted her regarding the taxability of the beer sales. It was not reasonable for them to rely upon Murphy's alleged statement that someone else was paying the tax. Petitioners gave Riley invoices as the exclusive source of information for computing their gross receipts from Williamson's Store. Petitioners knew that the sales of beer were not included in the invoices. Petitioners knew that if the invoices did not include all items sold in the store, that such sales would not be reported on the Schedules C for the business from the store. Therefore, petitioners knew that the income from the sale of the beer was not reported on their returns. In the words of the Court of Appeals for the Fifth *290 Circuit: We assume that common sense can be the possession of the unsophisticated, the unschooled, and the unlettered. [Petitioners], though not privileged to have the other ingredients, [were] in possession of common sense. [They] must have, by the exercise of common sense, known that the figures used in [their] tax returns were serious understatements of [their] obligations to [the] government. Innocent falsity is generally improbable; here it is impossible.
Webb v. Commissioner, 394 F.2d at 380. 2. A Portion of the Underpayment is Due to the Fraud of Each Petitioner.
In the case of a joint return, the additions to tax for fraud do not apply to a spouse unless some part of the underpayment is due to the fraud of such spouse. Sec. 6653(b) or (b)(4); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972). Petitioners argue that the store was primarily Vera's responsibility, that during the periods at issue, James had all but retired and took no interest in the store, except when Vera asked him to help in the store and, on very limited occasions, *291 to make bank deposits. Petitioners contend that Vera handled all of the financial matters involving the store, and did not involve James in the running of the day-to-day operations. Apparently, petitioners would have us conclude that any fraud could be attributable only to Vera. We do not agree. James pumped gas, accepted cash from customers, and sold beer during the years at issue. Furthermore, James made some of the beer purchases from Carnaggio Distributing. He knew that Riley was marking up invoices by adding 25 percent to the invoices to determine the income for the store. He knew that he was getting beer from Carnaggio, selling the beer, and getting money from those sales. He knew that he was not getting any invoices for those beer purchases and that Riley was not getting any invoices for those beer purchases. After reviewing the entire record, we hold that respondent has proved by clear and convincing evidence that a portion of the underpayment for each of the years at issue was due to fraud committed by both Vera and James. Accordingly, we sustain the fraud additions under section 6653(b) for 1980 and 1981, and under section 6653(b)(1) for 1982. 3. The Entire *292 Underpayment in 1982 Was Attributable to Fraud.
Respondent has also asserted a fraud addition under section 6653(b)(2) for 1982, which imposes a separate addition to tax (equal to 50 percent of the interest payable under section 6601) to the portion of the underpayment attributable to fraud. Respondent has the burden of proving by clear and convincing evidence the portion of the underpayment that is attributable to fraud. DiLeo v. Commissioner, 96 T.C. at 873; Franklin v. Commissioner, T.C. Memo. 1993-184. Petitioners' only sources of income in 1982 were interest income and income from Williamson's Store. Respondent did not allege any error in the amount of interest reported on the 1982 return. Thus, the entire underpayment is attributable to petitioners' unreported income from the operations of Williamson's Store. Petitioners argue that a substantial portion of the understatement of gross receipts is attributable to Riley's improper use of the invoice-markup method. They offer the testimony of a C.P.A., Aune, to support their contention. As noted in our findings of fact, we found Aune's reasoning to be circular *293 and wholly unpersuasive. See supra notes 13, 14. On their 1982 Federal income tax return, petitioners understated their gross receipts by $ 344,614.06 and their costs of goods sold by $ 235,381.61. Aune testified that he used petitioners' canceled checks and other documentation to determine the total costs of goods sold. To pay for the goods they sold, petitioners had written checks in amounts greatly in excess of the costs of goods sold as reported on their return. Petitioners knew that the costs of goods sold was grossly understated on the 1982 return. They knew that Riley calculated the gross receipts by marking up the costs of goods sold. Petitioners knew that profit made on the sale of such omitted goods was not reflected on their Federal income tax return for the year 1982. When Riley questioned Vera regarding the fewer invoices given to her for 1982, Vera told her that the reduction was due to the opening of a new store in the vicinity and that business was down. We are convinced that such response was intended to mislead Riley. Actually the profits from Williamson's Store in 1982 greatly exceeded the profits for the 2 preceding years, yet their return reported *294 a loss for the year. Riley prepared the return based on the costs of goods sold that petitioners furnished to her. [16] Petitioners reported the costs of goods sold in Williamson's Store in a fraudulent manner calculated to conceal, mislead, or otherwise prevent the collection of their Federal income taxes. We hold that respondent has proved by clear and convincing evidence that the entire underpayment of tax in 1982 was attributable to fraud and is subject to additions to tax under section 6653(b)(2). III Statute of Limitations
Petitioners' returns for 1980, 1981, and 1982 were filed more than 3 years before respondent mailed the statutory notice of deficiency for those years. Therefore, assessment of the deficiencies is barred *295 by the period of limitations on assessments as provided in section 6501(a), unless one of the exceptions otherwise provided in section 6501 applies. Respondent contends that the exception provided in paragraph (1) of section 6501(c) applies for all years at issue and that the exception provided in section 6501(e)(1) applies for the year 1982. Section 6501(c)(1) provides that the tax may be assessed "at any time" in the case of a false or fraudulent return with the intent to evade tax. Respondent contends that petitioners filed false returns in 1980, 1981, and 1982, with the intent to evade tax. Furthermore, respondent contends that, for each of the years at issue, petitioners willfully attempted to defeat or evade their income tax liabilities. Respondent, therefore, concludes she may assess the tax at any time. The definition of fraud for purposes of additions to tax under section 6653(b) also applies for purposes of determining the application of section 6501(c)(1). See Schaffer v. Commissioner, 779 F.2d 849, 857 (2d Cir. 1985), affg. Mandina v. Commissioner, T.C. Memo. 1982-34; Ruidoso Racing Association v. Commissioner, 476 F.2d 502, 505 (10th Cir. 1973), *296 affg. T.C. Memo. 1971-194; Tomlinson v. Lefkowitz, 334 F.2d 262 (5th Cir. 1964); Estate of Temple v. Commissioner, 67 T.C. 143, 159-160 (1976); McGee v. Commissioner, 61 T.C. 249, 252, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). We have held that both petitioners are liable for the fraud additions under section 6653(b) with respect to 1980 and 1981, and under section 6653(b)(1) and (2) for 1982. Therefore, the statute of limitations for all years did not expire prior to respondent's issuance of the notice of deficiency. Furthermore, with regard to the 1982 return, respondent asserts that the 6-year period provided in section 6501(e)(1) applies. If a taxpayer omits from his gross income an amount in excess of 25 percent of the gross income reported on his return, section 6501(e)(1) provides that respondent may assess the tax within 6 years after the taxpayer filed his income tax return. Gross income means the total of the amounts received from the sale of goods without a reduction for the costs of goods sold. Sec. 6501(e)(1)(A)(i). *297 On their 1982 income tax return, petitioners reported gross receipts of $ 47,157.94 on Schedule C and interest income of $ 17,330.85, for a total gross income of $ 64,488.79. In 1982, petitioners understated their gross income by $ 344,614.06, which is substantially greater than 25 percent of the gross receipts reported. Therefore, the 6-year limitations period applies to the 1982 return. Respondent issued petitioners a statutory notice of deficiency for the year 1982 on October 20, 1988, which falls within the 6-year limitations period. Thus, regardless of any fraud, the assessment for 1982 is not barred by the statute of limitations. IV Addition to Tax for Substantial Understatement under Section 6661
Petitioners reported zero tax on their 1982 return. The correct amount of tax due, as stipulated by the parties, was $ 34,787. Because petitioners understated their income tax in an amount greater than $ 5,000 or 10 percent of the tax required to be shown on their return, section 6661(b)(1)(A), we hold that petitioners are liable for the addition to tax under section 6661(a) for the year 1982. Decision will be entered for respondent.
Footnotes
1. For 1980 and 1981 the proper section was sec. 6653(b) rather than sec. 6653(b)(1)↩.
2. 50 percent of the interest due on $ 50,599.87.↩
1. Certain figures contained in the stipulations vary slightly from the figures on petitioners' returns. The parties have stipulated to the amounts by which petitioners understated their gross receipts and the costs of goods sold each year. However, other evidence in the record shows that the stipulated deficiency for 1982 is based on gross receipts and costs of goods sold other than the stipulated figures. Accordingly, the Court has corrected those figures for 1982.↩
2. Riley testified that she marked up the invoices by 25 percent for the years at issue but increased the percentage in later years. However, the gross receipts figures indicated on the returns are not equal to the costs of goods sold figures marked up by 25 percent, but amount to 19.2, 31.6, and 37.9-percent markups, respectively, for the years 1980, 1981, and 1982.↩
3. Vera testified that she wanted to know the amount of the weekly sales because, many years prior to the trial of this case, an IRS agent came to the store and wanted to know how much merchandise the store had sold. At that time she had no idea what the amount was, so she called Riley who gave the agent the figures for that year.↩
4. Vera testified that she kept half of any excess and gave half to Terry. The stipulated bank deposits during the years at issue do not support such a 50-50 split, but show that most of the deposits were made into accounts in the names of Vera and James. If Vera split the excess 50-50 with Terry, then part of Terry's share was not deposited into his bank account, and the gross receipts figures for the store were greater than the amounts determined by the bank deposits and cash expenditures method.↩
5. Mims did not know petitioners or their son, Terry, prior to 1980. Mims subsequently purchased cartons of cigarettes from Terry at a substantial discount. Mims drove to Williamson's Store and bought several hundred cartons of cigarettes from Terry for $ 1.50 per carton, when the wholesale price was approximately $ 6.00 per carton. In 1987, Mims was convicted of transporting and selling stolen goods. There is no indication that Mims' conviction was related to his purchase of cigarettes from Terry.↩
6. It is not clear whether Carnaggio Distributing paid this State wholesaler's sales tax out of its own funds or in fact added it to the amount collected from petitioners. However, any prepaid tax on this beer refers to the wholesaler's sales tax and not to any sales tax or other tax that is due from the retailer on his sales of such beer.↩
7. Each return constituted a separate count.↩
8. Some of these legal fees may have been for Terry's criminal trial. At the time of petitioners' trial in this Court, Terry was incarcerated in a Federal penitentiary in Atlanta, Georgia, for firearms and income tax crimes.↩
9. Vera testified that she and James "traded" property with Jack. Aside from petitioners' testimony, no other evidence of the transfers to Jack was presented in this case.↩
10. When asked whether he gave these funds to Jack, James testified that he used these funds to pay his attorneys' fees. James further testified that, to pay the attorneys' fees, Jack gave him additional money which Terry had given to Jack. There is no evidence in the record as to the amounts withdrawn from the accounts at that time.↩
11. The parties stipulated to understated costs of goods sold in the amount of $ 213,864.61, which together with the agreed increase of $ 21,517 amounts to $ 235,381.61.↩
*. Telephone expense is included with utilities expense on returns for 1981 and 1982.↩
12. This was simply an arithmetical computation by Aune (dividing the gross receipts figure on the Schedule C by the costs of goods sold figure on the Schedule C).↩
13. The stipulated correct gross receipts figures were determined by the bank deposits and cash expenditures method, and the stipulated correct costs of goods sold figures were determined by the specific items method (from bank statements, canceled checks, receipts, etc.). Therefore, Aune's calculations are comparing apples and oranges. We regard his computation as a meaningless exercise since dividing a figure for gross receipts by a figure for costs of goods sold will always produce a percentage but not necessarily a meaningful one. Trying to determine the "required" percentage markup is meaningless when applied to figures that were not computed on invoices or on a markup of invoices.↩
14. Without knowledge of the actual sales figures for the Mims-invoices beer, this too is a meaningless exercise. The record shows that Carnaggio Distributing gave petitioners special discounted prices for this beer, but the record does not show what those prices were, and most importantly does not show the profit on the sales of that beer.↩
15. Petitioners contend that Carnaggio and Murphy concocted the scheme of billing petitioners' purchase of beer through Mims, so that Carnaggio could keep his largest customer. Because petitioners could have purchased the beer from another distributor, they argue that the scheme only benefited Carnaggio. Petitioners ignore the fact that in addition to not paying any sales tax or income tax on such sales, petitioners were able to purchase the beer at substantially reduced costs, which, logic dictates, permitted petitioners to undercut competitors' prices and make large profits on such sales.↩
16. While there were also understatements of petitioners' deductible business expenses, those errors have been corrected and served to reduce the understatements of net profits and hence reduced the underpayments of tax. The remaining underpayments of tax are attributable to fraud.↩